*Decision will be entered under Rule 155.*

Gilbert R. Miller and Rita Miller, Petitioners *v.* Commissioner of Internal Revenue, Respondent

Docket No. 20724–83.    Filed May 13, 1985.

*William S. Huff, Charles A. Ramunno*, and *Bruce N. Lemons*, for the petitioners.

*Theodore J. Kletnick* and *William F. Garrow*, for the respondent.

Whitaker, *Judge*: Respondent determined a deficiency in income tax for petitioners' 1979 taxable year in the amount of $104,236. Due to concessions, the sole issue for determination is the deductibility of short-term losses in the amount of

---

$103,325 from trading in commodity futures straddles claimed on Schedule D of petitioners' income tax return.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Throughout the year 1979, petitioners were husband and wife, although they are now divorced. At the time of the filing of the petition in this case, each of petitioners was a resident of the State of Colorado.[1] Petitioners' income tax return for the year 1979 was filed, using the cash method of accounting. Mrs. Miller is involved in this proceeding only by reason of having filed a joint return with Mr. Miller (referred to herein as petitioner).

Only a brief description of commodity futures trading is necessary.[2] In general, a futures contract is an agreement to deliver or to receive a specified quantity and grade of a designated commodity during a designated month in the future (a position).[3] A futures contract is either a contract to sell—a "short" position, or a contract to purchase—a "long" position. A single position calling for the purchase or sale of a designated commodity is described as an "open contract" whereas acquisition by the same person of two or more positions calling for the purchase of a specified commodity in one or more months and for the sale of the same commodity in one or more different months is described as a straddle. Each of such positions is sometimes referred to as a "leg" of the straddle.[4] Customarily, persons trading in commodity futures do not hold contracts to the date of delivery or make or receive delivery of the specified commodity; rather, such contracts are generally closed out by the acquisition of an offsetting purchase or sale of the same quantity of the commodity for the same month.

Whenever an open position is held, price changes in the commodity futures directly affect the economic position of the

---

[1] Mr. Miller at the time of trial was a resident of California.

[2] The mechanics of trading through the Commodity Exchange, Inc., in commodity futures is discussed in detail in our decision in *Smith v. Commissioner*, 78 T.C. 350 (1982), to which reference is made.

[3] The word "position" is of particular importance in the application of sec. 108 of the Tax Reform Act of 1984 which is dispositive of this case.

[4] For definitional purposes, it is immaterial whether the delivery month of the long position or of the short position is nearer to the date of acquisition of the straddle.

holder. In a straddle, by contrast, the holder is concerned only with changes in the spread—the difference between the price of each leg of the straddle. If the prices of the short and long legs of the straddle move exactly in tandem so that the spread does not change, the holder will suffer no economic consequence since the unrealized gain and loss will be exactly offset. On the other hand, if the spread widens or narrows, the holder will incur either an economic net gain or loss.

Whenever any leg of a straddle is closed out by the purchase of an exactly opposite position, tax consequences normally will result, either a realized gain or loss. If no other action is taken, where the straddle consisted of only two positions, that position which was not closed out becomes simply an open contract. In straddle trading, however, and particularly in tax-motivated straddle trading, customarily the loss leg will be closed out in order to realize a tax loss and a similar position acquired in a different month so that the economic consequences and risks to the holder are minimized. This substitution of one position for a similar position in a different month is sometimes referred to as a "switch."

Straddle transactions having as their principal objective the achievement of "deferral" (postponing to a later year an already realized gain in an unrelated transaction) or "conversion" (changing a short-term capital gain on an unrelated transaction to a long-term capital gain) are commonly referred to as "tax straddles" by the brokerage industry. Trading in tax straddles will always show a pattern of switching of the loss leg in the initial year in order to generate tax losses (which are utilized to offset the realized unrelated gain) while minimizing economic losses. Long-term capital gains are achieved by holding the profit position (if a long position) for more than 6 months prior to closeout.[5]

It is generally understood that substantially all (85 to 90 percent) commodity futures trades result in losses. Nevertheless, there are opportunities for realizing profits in trading in commodity futures, including trading in straddles. The use of a straddle tends to minimize the risk of losses, but at the same

---

[5]Long-term capital gains can be achieved only through a long position. Short-term capital gains on a short position cannot be converted into long-term capital gains because of the anti-conversion rules set forth in sec. 1233(b). Thus the maximum tax advantage is achieved where gain is on the long position and loss on the short.

time reduces the profit opportunities. Every position held by a person is matched by an exactly opposite position (or series of positions) held by one or more other persons. Thus, a loss realized on closeout will be matched by the realization of gain in the same amount, provided the opposite position was acquired at the same time and held to close out.

Beginning in 1971, Merrill Lynch Pierce Fenner & Smith, Inc. (Merrill Lynch), which as broker handled petitioners' trades which are in issue, formed in its New York City office a unit within its commodity division referred to as the "Tax Straddle Department,"[6] under the management of Tom O'Hare. During the relevant period in 1979 and 1980, this department also included Ray Shevlin. This department assisted Merrill Lynch field account executives in achieving tax losses and deferrals desired by customers by recommending and helping to implement trading strategies in commodity futures. During the period 1975 through 1980, most of the customers who utilized the services of the Merrill Lynch Tax Straddle Department desired and, in fact, achieved substantial tax losses through switches made in the initial year of the straddle transaction or series of transactions.

Petitioner is a college graduate with a degree in geology, and for approximately 20 years his principal income-producing activities have been in various aspects of oil and gas exploration. Since the year 1964, petitioner has been actively trading for his own account in commodity futures. Petitioner has always used what is known as a nondiscretionary account with his brokers, in that investment decisions were and are made by him personally. Petitioner generally acquired open positions and rarely held any position for a substantial period of time. In 1969, petitioner and several other individuals formed a corporation called Computrade, Inc., to engage in commodity futures trading on a large scale. This continued until 1974 or 1975, and during the initial years, petitioner personally handled the corporation's trading activities. Computrade, Inc., made more than 1,000 trades in a variety of futures contracts, all of which were open positions.[7] By the year 1979, petitioner

---

[6]This department was apparently also known as the Financial Services Department.

[7]On this record, we cannot determine how many of these trades were handled by petitioner personally, but the utilization of only open positions clearly was consistent with and must have reflected petitioner's personal trading philosophy.

was a sophisticated trader in commodity futures transactions, with the knowledge, experience, and confidence to make futures trading decisions on the basis of his own analysis of facts and on recommendations solicited by him from brokers and their account executives. It was petitioner's practice when "playing" commodities to check on his positions at a minimum every day, because it "is a very high-risk game."

During the period 1975 to 1983, petitioner made 158 commodity futures trades for his personal account—almost 20 per year. Of these, 114 were open positions and 44 were straddles. Of the 44 straddles, only 4 included switches. Three of these four are the transactions at issue here—gold futures straddle trades made between October 19, 1979, and April 21, 1980.[8] These trades are set forth in detail in Appendix A (pp. 848–849 *infra*) attached hereto. They required an initial margin deposit of about $6,000.[9]

Petitioner opened an account with the Denver office of Merrill Lynch in approximately 1964, consistently using Glenn Mathers, a college friend, as his account executive. Until 1975, trades through Mathers were in stocks and bonds. Petitioner's Merrill Lynch commodities account was opened on December 31, 1974. Prior to 1975, other brokers were used for commodity futures trading.

A number of facts are of particular significance in this case. Prior to the initiation of petitioner's gold futures trades, Mathers had never consulted with or utilized the expertise of the Merrill Lynch Tax Straddle Department for the benefit of

---

[8]The numbers of trades, straddles, and switches during the period 1975–83 were stipulated. Since the terms "transaction" and "trade" were not defined, we cannot determine definitively what portion of the 44 straddles the gold straddles here in issue represent. (See note 13 *infra*.) As shown by Appendix A and viewing as we do the trades on Dec. 3 and 4, 1979, as parts of a single trade, these gold straddles included four distinct straddles, three of which were acquired in 1979 and the fourth in 1980. The second straddle was created by switching one position. The third straddle was a so-called butterfly, created by switching one short position into two short positions. Thus, two switches occurred in 1979, the only year before us, and one in 1980.

[9]Margin is the amount of money or collateral required to be deposited by a customer with his broker when trading in commodity futures is initiated. It does not constitute a part payment on the purchase price of the futures contracts acquired but rather serves to insure the brokers against loss incurred in the futures trading. The original margin amount is fixed by the particular exchange through which the trading is effected. In all cases, margin is substantially less than the aggregate cost of the initial positions. Additional margin may be required, or refunds may be made, to offset unrealized economic losses or gains incurred during trading. Generally, the amount of required original margin is greater for trades in open futures contracts than in straddles since the risk is substantially greater. As a result, profit or loss may be measured or tested against the aggregate margin deposited—the money required to engage in the trading—as well as against the cost of the futures contracts acquired.

petitioner (or any other customer), and he did not utilize the Tax Straddle Department for petitioner's trades after this series of gold straddles. Moreover, it was only with respect to these gold futures trades that Mathers used a New York specialist to place the trades with a floor broker at the Commodity Exchange, Inc. Mathers, himself, placed all of petitioner's other futures trades with a floor broker. At some point shortly before the first gold straddle trade on October 19, 1979, Mathers talked to O'Hare and was referred to Shevlin for expert assistance.[10] Each of petitioner's gold futures transactions was discussed by Mathers with Shevlin prior to submission of the recommendation to petitioner for approval. Shevlin's recommendations were either volunteered by him to Mathers or solicited by Mathers and conveyed to petitioner by Mathers.[11] Petitioner directed or approved each acquisition and disposition of each position.

Shevlin recorded on his working papers at the outset that petitioner's tax objective was a $100,000 tax loss for the year 1979. That information was directly or indirectly provided to Shevlin by Mathers. This tax objective was known to petitioner and had his approval, although whether the precise sum of $100,000 was suggested by petitioner or by Mathers or by Shevlin is unclear.[12] Petitioner was advised by Mathers as to the entire strategy of this series of gold trades which was a coordinated plan recommended by Shevlin to achieve a prescribed tax loss objective. As can be seen from Appendix A (pp. 848–849 *infra*), the series of switches effected during December

---

[10]Mathers now recalls only that O'Hare had a reputation for expertise in commodity futures trading, including straddles, and that O'Hare's department was involved in gold straddles. Why he felt impelled in this instance to consult with the Tax Straddle Department, he could not satisfactorily explain. However, throughout his testimony, Mathers' memory was poor, conveniently so, it would seem.

[11]Petitioner had no direct contact with Shevlin until the time of trial preparation and no contact at all with O'Hare.

[12]Although petitioner strenuously denies tax motivation as well as knowledge of this tax objective, his denials are not credible. There was a substantial similarity between the trades executed by petitioner and those of a number of the other customers of the Tax Straddle Department. In particular, a number of the other customers of this department also made petitioner's initial transaction on the same date, though in different units. Petitioner's gold straddle trades were contrary to his customary trading practice of acquiring open positions, and his use of switches in every one of this series of gold trades is almost unique in petitioner's commodity futures trading. Finally, the retention by petitioner of a single position for 6 months was without precedent. There is no satisfactory explanation for these uncustomary futures trades other than that they reflect the tax strategy of the Merrill Lynch Tax Straddle Department and were designed to achieve the $100,000 tax loss objective.

1979 created $103,325 of tax straddle losses which were included in the $99,708 net short-term commodity losses claimed by petitioner on his 1979 tax return. The series of gold futures straddle transactions ending in April 1980 resulted in an overall net loss for the 6-month period of slightly over $25,000. Petitioner's series of switches are typical of tax straddles. We note particularly that the initial long position of 15 August 1980 contracts which showed a continuing gain was held for 6 months and 2 days, providing a long-term capital gain. All of the switches, on the other hand, were in petitioner's short positions in order to recognize losses.

The initial gold straddle transaction of petitioner on October 19, 1979, was placed and approved by petitioner with the primary intent or motive of realizing tax losses in 1979 in an amount approximating $100,000 and long-term capital gains in 1980. It was contemplated by petitioner, Mathers, and Shevlin at the time of placing the order to acquire the October 19, 1979, position that one or more switches would be effected in order to realize the desired 1979 tax loss goal. Thus, the October 19, 1979, transaction was a part of and the initial step in petitioner's "entire commodity tax straddle scheme," designed to achieve the 1979 tax loss goal and the deferral to 1980 of unrelated 1979 capital gains. We assume that petitioner had an incidental profit motive, but it is more realistic to conclude—as we do—that he intended that the long-term gain which he expected to realize by holding the long element of the initial straddle would allow him to offset the realized losses and transaction costs.[13] Each of the succeeding gold futures trades, including the final closeout in April 1980, was similarly tax motivated. Thus, each disposition of a position in December 1979 was intended to achieve the tax loss thereby realized. Each new straddle simultaneously acquired was tax motivated and each reduced the profit potential. However, gain or loss in each position depended upon market movement over which these players had no control.

Interest rates and the prices of gold and gold futures were exceedingly high during this 1979–80 period. Upon the date on which each separate gold straddle was acquired by petitioner, it was reasonable to believe that the prices of gold and hence

---

[13]Commissions and fees of $3,447.50 were paid by petitioner to Merrill Lynch in connection with the gold futures straddles in issue.

gold futures, would fall instead of continuing to rise. A relatively small downward movement in the prices of gold and gold futures during the 1979–80 period involved in petitioner's gold futures trades could have produced a net economic profit, after taking into account transaction costs and fees, on each separate straddle on the respective dates on which each position was closed out, including the final closeout of all positions on April 21, 1980. In that event, the 1979 net loss shown in Appendix A would have been converted into a net gain. Therefore, there was for each of petitioner's 1979 gold straddles a reasonable prospect of some profit at the time acquired.

## OPINION

Were it not for the interpretative problem created by the application to this case of section 108 of the Tax Reform Act of 1984 (section 108),[14] our findings of fact would mandate the application here of our recent decision in *Smith v. Commissioner*, 78 T.C. 350 (1982), as amplified by *Fox v. Commissioner*, 82 T.C. 1001 (1984). In fact, but for section 108, much of the language of the critical portion of our opinion in *Smith* might be repeated verbatim. For example, respondent here argues that petitioner's losses are not allowable because they were not "incurred in any transaction entered into for profit" within the meaning of section 165(c)(2).[15] As we said in *Smith*:

For purposes of applying section 165(c)(2), respondent has treated the relevant "transaction" as an investment in a "commodity tax straddle," while petitioners have on the whole treated the transaction as an investment in * * * straddles. This distinction is an important one and goes far toward explaining the different conclusions reached by petitioners' and respondent's experts as to the potential historical profitability of petitioners' investments. * * * We agree with respondent that what petitioners invested in with Merrill Lynch were commodity tax straddles—i.e., a prearranged, planned sequence of trading along the lines studied by respondent's expert— not simple investments in * * * straddles held solely for nontax profit objectives. For purposes of section 165(c)(2), then, we hold the relevant "transaction" to encompass petitioners' entire commodity tax straddle scheme.

---

[14]Division A of the Deficit Reduction Act of 1984, 98 Stat. 494.

[15]All section references, with the exception of sec. 108, are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The mere fact that petitioners may have had a strong tax-avoidance purpose in entering into their commodity tax straddles does not in itself result in the disallowance of petitioners' losses under section 165(c)(2), provided petitioners also had a nontax profit motive for their investments at the time. Such hope of deriving an economic profit aside from the tax benefits need not be reasonable so long as it is bona fide. However, the existence of a nontax profit objective is a question of fact on which the petitioners bear the burden of proof. In ascertaining petitioners' subjective intent, this Court is not bound by the taxpayer's uncontradicted assertions of proper motive made * * * years after the events in issue.

[Contemporary] evidence, we think, belies any nontax motive on petitioners' part.

[78 T.C. at 390–391; citations and fn. ref. omitted.]

But for section 108, on the authority of *Smith*, we would be prepared to find against petitioner since petitioner "lacked the requisite economic profit objective necessary to enable [him] to deduct [his] commodity tax straddle losses in [1979]." 78 T.C. at 394. A profit motive which is merely incidental does not suffice for section 165(c)(2). *Fox v. Commissioner, supra.*

Petitioner, here, insists that he initiated his gold transactions with a profit objective, thinking in 1979 that both gold prices and interest rates would go down. In point of fact, exactly the opposite happened. It is probably true that petitioner, a sophisticated commodity futures trader, hoped that in some fashion he might make an overall profit or at least break even. Petitioner's entire business life, during which his principal activity has been oil and gas exploration, has many aspects of professional gambling. We are convinced that petitioner had at least an incidental profit motive in every business transaction which he entered including these gold straddles, but his contention that he was unaware of, or indifferent to, the tax consequences of the switches in positions made in December 1979 is simply not believable. Petitioner's intelligence, his experience in commodity futures trading, and his sophistication as a businessman and commodities trader belie his efforts to convince us that he was not fully aware that realization of a tax loss during the year 1979 was the primary motive for his entering into this series of gold straddle transactions.[16] While

---

[16]As a witness, we found petitioner to be neither forthright nor convincing. His answers to many questions put to him by his own counsel, on cross-examination and by the Court, were ambiguous often with an appearance of a studied attempt at confusion. The following colloquy between the Court and petitioner is illustrative:

Q. And it is on account of those factors that you found it necessary to change your position

we do not doubt his testimony that he had no contact with Shevlin prior to trial preparation, we cannot and do not credit the implication from his testimony that he was unaware that the advice he received from account executive Mathers was derived from the Merrill Lynch Tax Straddle Department and was geared toward achievement of a $100,000 tax loss during the last quarter of 1979. We are certain that Shevlin would not have established the $100,000 loss objective without being convinced by Mathers that it represented this customer's goal. We are further convinced that the relationship of Mathers and petitioner was such that Mathers would not have conveyed such information to Shevlin without petitioner's knowledge and concurrence. Mathers was simply the go-between, conveying the tax straddle expert's recommendations to petitioner and petitioner's authorization to Shevlin.

The pattern of switches in these gold commodity futures transactions, totally different from petitioner's trading pattern during the prior 15 years, is too significant to ignore. The self-serving testimony[17] of petitioner and of Shevlin, that each switch was profit oriented is unconvincing, especially when one understands that each of the 1979 transactions subsequent to the acquisition of the initial straddle, in fact realized tax losses and slightly over achieved the $100,000 loss goal, while also materially decreasing the possibility of obtaining an overall profit. We cannot fail to note also that, if the market had in fact reversed its course, the profit would have been in the short leg of the straddle instead of the long leg, and the long-term capital gains goal would not have been achieved. Thus, we can at least infer that the trading strategy was predicated on the assumption that the price of gold would continue to rise, petitioner's testimony to the contrary notwithstanding. Despite any residual or inherent profit motive

---

more frequently in gold?

A. Well, I really didn't think I changed it that— You know, obviously, when you compare this — This is an unusual time that I'm doing this. In other words, World War III is almost to start. I mean, I'm in—they're just different from most of the others. I mean, the Iranian crisis, the Afghanistan crisis, gold is all at once making severe moves that it has never done historically. Interest rates are going out of sight. I'm making changes.

Obviously, the thing that I should have done is just reverse my position rather than to start hedging down. All of these moves are kind of hedges down. It's all hindsight now, but I should have completely reversed it, and then I would have made a substantial profit out of the thing.

[17]Greater weight is to be accorded objective facts than self-serving statements as to intent. *Siegel v. Commissioner*, 78 T.C. 659, 699 (1982).

petitioner may have had, the record here mandates our finding that petitioner's gold trades here in issue were primarily tax motivated. That is crystal clear on this record. It is not merely coincidental that the same tax straddle department which worked for petitioner, here, also effected the tax losses for the petitioners in *Smith v. Commissioner, supra.* And as we found in *Fox v. Commissioner, supra,* petitioner's tax motive was primary.

Having determined that under *Smith* and *Fox* we would find for respondent, the sole remaining issue, but the overriding one, is whether section 108 requires us to reach a different conclusion.[18] To the extent pertinent, section 108 provides as follows:

(a) GENERAL RULE.—For purposes of the Internal Revenue Code of 1954, in the case of any disposition of 1 or more positions—
(1) which were entered into before 1982 and form part of a straddle, and
(2) to which the amendments made by title V of the Economic Recovery Tax Act of 1981 do not apply,
any loss from such disposition shall be allowed for the taxable year of the disposition if such position is part of a transaction entered into for profit.
(b) PRESUMPTION THAT TRANSACTION ENTERED INTO FOR PROFIT.—For purposes of subsection (a), any position held by a commodities dealer or any person regularly engaged in investing in regulated futures contracts shall be rebuttably presumed to be part of a transaction entered into for profit.
[Tax Reform Act of 1984, Pub. L. 98–369, sec. 108, 98 Stat. 630.]

The applicability of section 108 is clear. The losses in question were incurred during 1979 in the disposition of "1 or more positions" which were entered into in that year and to which the amendments made by title V of the Economic Recovery Tax Act of 1981 do not apply.[19] Thus, the losses incurred in petitioner's switches which took place in December 1979 are to be allowed for the year 1979 if each position which was so disposed of "is part of a transaction entered into for profit." Each position did form part of a straddle. Our decision turns on whether each straddle was a transaction entered into for profit.

---

[18]In addition to the briefs of the parties, we have considered the brief amicus curiae of Dorchester Partners and Edward O. and Vivian S. Thorp filed by leave of the Court on Sept. 25, 1984. The arguments advanced in said brief were effectively presented by petitioners in this case and, therefore, will not be separately addressed in this opinion.

[19]This provision is effective as to transactions like those at issue here which were entered into after June 23, 1981.

That critical phrase—"transaction entered into for profit"—is identical with the language of section 165(c)(2). Respondent forcefully argues that this statutory language is unambiguous; hence the legislative history is immaterial and cannot be used, as petitioner urges, to alter the meaning of the phrase. However, respondent conveniently ignores the fact that in the two pertinent cases on which respondent would rely, *Smith v. Commissioner*, 78 T.C. 350 (1982) and *Fox v. Commissioner*, 82 T.C. 1001 (1984), this Court was forced to interpret this assertedly unambiguous section 165(c)(2) language—"transaction entered into for profit." Section 165(c)(2) does not tell us whether to use the taxpayer's subjective intent or some objective standard in applying the statute. Neither does it furnish guidance when the taxpayer is shown to have had more than a single motive. Thus, in *Fox* we established that it is the petitioner's primary motive to which we must look and that a merely incidental profit motive is immaterial. Our interpretation of this phrase in the section 165(c)(2) context demonstrates that it is sufficiently ambiguous to warrant our search for interpretative assistance. We simply cannot agree with respondent that we should ignore the legislative history accompanying section 108.[20] Respondent also argues that by using in section 108 the section 165(c)(2) verbiage, Congress must have intended identical interpretations. See, e.g., *Munson v. McGinnes*, 283 F.2d 333 (3d Cir. 1960), cert. denied 364 U.S. 880 (1960); *Bond Crown & Cork Co. v. Commissioner*, 19 T.C. 73 (1952). While that would be a persuasive argument in the absence of congressional guidance, we do have legislative history here.

Section 108 had no precise counterpart either in the House or the Senate versions of the bill; the only legislative history available is the Conference Committee report,[21] which in pertinent part reads as follows:

---

[20] Our obligation to look at legislative history is aptly stated in *J.C. Penney Co. v. Commissioner*, 37 T.C. 1013 (1962), affd. 312 F.2d 65 (2d Cir. 1962), where we said:

"Petitioner's contention that section 392 is clear and unambiguous is evidently aimed at preventing the Court from looking to the legislative history of that section and those related to it. * * * Furthermore, it is now established beyond successful challenge that a court may seek out any reliable evidence as to legislative purpose regardless of whether the statutory language appears to be clear. [37 T.C. at 1016, 1017. Citations omitted. See also *Huntsberry v. Commissioner*, 83 T.C. 742, 747–748 (1984).]"

[21] H. Rept. 98–861 (Conf.) (1984), 1984–3 C.B. (Vol. 2) 1, 171.

Accordingly, * * * the conference agreement provides that a loss on the disposition of a position entered into before 1982 will be allowed, except to the extent nonrecognition is required under any applicable provision, if the position is part of a transaction entered into for profit. * * * The loss generally will be allowed for the taxable years in which the position is disposed of. * * *

* * * In determining whether the position is part of a transaction entered into for profit, it is intended that the provision be applied by treating the condition as satisfied *if there is a reasonable prospect of any profit* from the transaction.

In the case of commodity dealers and persons actively engaged in investing in RFC's the provision is to be applied by presuming that the position is held as part of a transaction entered into for profit unless the Internal Revenue Service establishes to the contrary. In determining whether a taxpayer is actively engaged in trading in RFC's with an intent to make a profit, a significant factor will be the extent of transaction costs. If they are sufficiently high relatively to the scope of the taxpayer's activities that there is no reasonable possibility of a profit, the presumption will be unavailable. * * *

[Emphasis supplied.]

Section 108 was adopted after the submission of this case following extensive trial but prior to briefing. The parties have not called to our attention any case and we are unaware of any which under these circumstances would preclude the application of this new statute to the case at bar.[22] Respondent argues that application of section 108 to cases such as that of petitioner in a fashion which would preclude the application of our opinions in *Smith* and *Fox* would discriminate against those taxpayers who in deference to these cases had accepted respondent's limited settlement offers. That kind of discrimination, however, if it is to be so characterized, is a result of congressional action and both taxpayers and the Commission-

---

[22]With respect to subsec. (b) of sec. 108, the retroactive application of the presumption in favor of "any person regularly engaged in investing in regulated futures contracts" can pose at least theoretical difficulties. This case was tried without knowledge of this provision and therefore without specifically taking into account the presumption. Although neither party has sought to reopen the record, both parties argued this presumption issue on brief. Without belaboring the point, the transactions in issue here are regulated futures contracts and our findings make it appear that petitioner would be a person regularly engaged in investing in such contracts. On the other hand, it is far from clear that under respondent's temporary regulations (sec. 1.165–13T, Temporary Income Tax Regs.), petitioner would be so classified. The temporary regulations establish requirements which are not suggested either by the legislative language or committee report. However, in this case, this issue is moot. Both parties introduced extensive evidence, both documentary and oral testimony. Our findings of fact are based on the entire record, without reference to any presumption and the record is fully adequate to support them. We, therefore, express no opinion either on the temporary regulations in so far as they bear on this statutory presumption or on the availability of that presumption to petitioner in this case.

er must look to Congress for correction of the perceived inequity.

The narrow question before us is whether or not we are to apply to this case the test of *Smith* and *Fox* or must we interpret the phrase "transaction entered into for profit" on the basis of the legislative history of section 108—that is to allow losses on dispositions of positions if "there is a reasonable prospect of any profit from the transaction." Respondent seeks to rely on his section 108 temporary regulations[23] to bolster his arguments that petitioner's losses should be disallowed. Petitioner argues that these temporary regulations, as applied to this case, are invalid as they are directly contrary to the origin, purpose, and intent of section 108.

The applicable provisions are printed in Appendix B (p. 847 *infra*), but for practical purposes their essence is stated in the following extract from the preamble:

The regulations state that section 108 of the Act does not change the standard for allowance of losses under section 165(c)(2) of existing law. In the case of straddles see *Fox v. Commissioner*, 82 T.C. No. 75 (1984) and *Smith v. Commissioner*, 78 T.C. 350 (1982). Under *Fox v. Commissioner*, a transaction is considered entered into for profit in the case of a straddle only if the taxpayer *entered into, and maintained, the transaction for the primary purpose of realizing an economic profit.* In addition, for section 108 of the Act to apply, the transaction must have sufficient substance to be recognized for federal income tax purposes.

The construction by the regulations that section 108 of the Act does not change the for-profit standard derives from the use in both that section [and section[24]] 165(c)(2) of the Code of the identical phrase "transaction entered into for profit." The continued utilization of the for-profit standard of section 165(c)(2) in section 108 of the Act reflects the Congressional purpose to provide certainty in the treatment of tax straddles entered into prior to ERTA.

[Emphasis supplied.]

On brief, respondent insists that section 108 simply adopted existing law. He argues that the statute is not intended to grant amnesty to all pre-ERTA[25] straddles and, finally, if the legislative history is to be taken into account, respondent with considerable ingenuity interprets the phrase "reasonable pros-

---

[23]Sec. 1.165–13T, Temporary Income Tax Regs., T.D. 7968, filed Aug. 21, 1984.

[24]These two words appear in the printed version of T.D. 7968, 1984–40 I.R.B. 4. They do not appear in the version in 49 Fed. Reg. 33444 (Aug. 23, 1984). It appears that the omission from the Federal Register is a typographical error.

[25]Economic Recovery Tax Act of 1981, Pub. L. 97–34, 95 Stat. 172.

pect of any profit" as imposing a more stringent test than section 165(c)(2). Thus respondent would interpret the Conference report to require "a significant potential to realize profits of a type normally sought by someone entering into a transaction for profit—profits of a size and magnitude attractive to a reasonable businessman." We simply do not agree.

The mere fact that section 108 uses the same verbiage as section 165(c)(2) does not require us to ignore its legislative history and interpret it as incorporating the section 165(c)(2) case law, i.e., *Smith* and *Fox*. While we might wish that Congress had made its collective intent clearer by use of more precise statutory language, we must, nevertheless, decide whether these temporary regulations harmonize not only with the plain language but also the *origin* and *purpose* of the statute. *United States v. Vogel Fertilizer Co.*, 455 U.S. 16 (1982). For the reasons indicated herein, we find that the requisite harmony is lacking.

When testing a regulation, we apply well-established rules as set forth in our recent decision in *Stephenson Trust v. Commissioner*, 81 T.C. 283 (1983):[26]

> The Commissioner has broad authority to promulgate all needful regulations. Sec. 7805(a); *United States v. Correll*, 389 U.S. 299, 306–307 (1967). Treasury regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes." *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501 (1948). Regulations, as constructions of the Code by those charged with its administration, "should not be overruled except for weighty reasons." *Bingler v. Johnson*, 394 U.S. 741, 750 (1969); *Commissioner v. South Texas Lumber Co.*, supra at 501.
>
> Although regulations are entitled to considerable weight, "respondent may not usurp the authority of Congress by adding restrictions to a statute which are not there." *Estate of Boeshore v. Commissioner*, 78 T.C. 523, 527 (1982). See *State of Washington v. Commissioner*, 77 T.C. 656 (1981), affd. 692 F.2d 128 (D.C. Cir. 1982). A regulation is not a reasonable statutory interpretation unless it harmonizes with the plain language, origin, and purpose of the statute. *United States v. Vogel Fertilizer Co.*, 455 U.S. 16 (1982); *Durbin Paper Stock Co. v. Commissioner*, 80 T.C. 252, 257 (1983).
> [81 T.C. at 287–288.]

It is worth noting that these regulations were issued as temporary regulations because of the "need for immediate

---

[26]We note that here as in *Stephenson Trust v. Commissioner*, 81 T.C. 283 (1983), the regulations were issued under the Commissioner's general power (sec. 7805) and are to be accorded less weight than legislative regulations. *Estate of Boeshore v. Commissioner*, 78 T.C. 523, 527 n. 5 (1982).

guidance." That need obviously involved a number of pending cases, including this one, where respondent was engaged in litigation over straddle losses. There is at least some question whether a regulation issued to buttress respondent's litigating position is entitled to any special presumption of validity. See, e.g., *Chock Full O'Nuts Corp. v. United States*, 453 F.2d 300, 303 (2d Cir. 1971). That aside, there appears to be little excuse for the temporary regulations except to try to avoid undercutting respondent's tax straddle litigating position, successfully achieved in *Smith* and *Fox*.

The legislative history makes it clear that Congress was aware of the Commissioner's litigating position on straddles and of our decision in *Smith v. Commissioner*, 78 T.C. 350 (1982). In that context, Congress did not wish "to prolong the uncertainty with respect to the treatment of losses claimed with respect to straddle positions for periods prior to 1981." If Congress had intended to legislate the results of our *Smith* and *Fox* decisions, it could very simply have made the ERTA rules retroactive or clearly embraced our decisions. It did neither. To the contrary, the Conference agreement "provides that a loss on the disposition of a position entered into before 1982 *will be allowed* * * * if the position is part of a transaction entered into for profit." (Emphasis supplied.) The Conference agreement goes on to define the term—transaction entered into for profit—by giving us the test "if there is a reasonable prospect of any profit." This is not the test of *Smith* as Congress well knew. And if respondent is correct in arguing that this legislation was also adopted with knowledge of *Fox*,[27] which we doubt, the section 108 test is certainly at the opposite end of the spectrum from the primary profit motive of *Fox*.

We hold that section 108 adopts an objective test and directs that losses be allowed on the disposition of a position if that particular straddle transaction can be said to have held "a reasonable prospect of any profit" at the time the straddle was acquired. The temporary regulations are plainly inconsistent with section 108 as so construed in accordance with its legislative history; the regulations insofar as they adopt the *Smith-Fox* test are invalid.

---

[27]Mr. Rostenkowski submitted the Conference report on H.R. 4170 to the House of Representatives on Friday, June 22, 1984, whereas our opinion in *Fox* was filed on Monday, June 25, 1984.

To apply the objective test of section 108, we must first determine what was intended by the terms "transaction" and "position." Although not free from doubt, we believe that the term "transaction" should be deemed to refer to each separate straddle when, as here, that analysis is feasible. We recognize, however, that there may be circumstances where factually or otherwise it would be difficult or unduly burdensome to apply this straddle-by-straddle analysis. In those cases, the *Smith* approach provides an acceptable alternative. Under either alternative, the term "position" refers to one of the legs of each straddle. We are directed to apply section 108 when losses occur, that is, whenever during a year before us legs are disposed of and tax losses realized.[28] However, prior to analysis of the straddles in this case, one further aspect of straddle trading must be noted.

As we have found, substantially all commodity futures trading results in losses, but taxpayers continue to trade in the hope of making that "big killing," the proverbial goal of every gambler. If one were to judge commodity futures trading by customary business standards, one could conclude that no person trading in commodity futures contracts ever has a *reasonable* prospect of any profit. That simply cannot be the interpretation intended by the Conference agreement. As petitioner himself testified, there is a great similarity between oil and gas exploration and commodity futures trading. Dry holes may predominate but that is not to say that in no circumstances can it be said that an investor in oil and gas exploration does not have a "reasonable prospect of any profit."

Unquestionably, the use of the word "any" in this phrase was intended by Congress to have meaning. This is confirmed by the direction in the Conference agreement to compare the profit potential with the transaction costs. The phrase "any profit," therefore, requires some prospect for dollar gain over cash investment plus transaction costs. However, the profit potential need not equate with, relate to, or exceed some arbitrary percentage of the investment, whether investment is defined as the total initial margin, the aggregate margin cost,

---

[28]Since a position is disposed of by the acquisition of the opposite position—one unit long January 1986 is disposed of by acquiring, i.e., selling, one unit short January 1986—this matching or offsetting position is to be ignored.

the face value of any single position acquired, or the aggregate face value of all the positions comprising the straddle determined as of the date acquired. Finally, whether or not the prospect of any profit is reasonable is tested on a facts and circumstances basis in the context of the futures market for the particular commodity at the time the trades are made.

Thus, the final question to ask is whether the particular straddles here involved had a reasonable prospect of any profit in the then-existing market. On this record, we simply cannot determine whether the prospect for a profit from these straddles in a rising market was a reasonable one. If, however, the market had reversed its course, one of respondent's experts is in agreement with petitioner's expert that profits were foreseeable from these straddles.[29] There is every reason to believe, as we do, that each of the straddles to be tested here had, when acquired, a reasonable prospect for profit and there is no evidence to the contrary. Speculation in commodity futures was not an exact science in 1979. The pertinent facts and circumstances support our conclusion. The section 108 requirements are met.

Respondent, on the authority of *Knetsch v. United States*, 364 U.S. 361 (1960), and similar cases, including our decision in *Hilton v. Commissioner*, 74 T.C. 305 (1980), affd. 671 F.2d 316 (9th Cir. 1982), cert. denied 459 U.S. 907 (1982), further argues that there is no economic substance, or at best, minimal economic substance, to petitioner's gold trades; hence the losses must be disallowed notwithstanding section 108. We again disagree. There is force to the opinions of respondent's experts that there was no real economic substance to the gold straddle switches, meaning that petitioner's economic position was not altered materially thereby. Respondent's experts also testified that the reward or profit potential in these straddles was insufficient to attract a profit-motivated person. Hence an individual, intending to speculate in commodity futures for profit, probably would not have made these trades. We do not disagree. Tax losses, not economic profit, motivated petitioner.

---

[29]Dr. Roger Gray, one of respondent's expert economists, testified that during the October 1979—April 1980 period, opinion was split as to the direction which gold futures prices would take. Hence a straddle investment strategy predicated on the assumption that prices would decline was reasonable. Dr. Gray described petitioner's prospect for profits in a declining market as "modest." Respondent's second expert testified, as did other witnesses, that the switches reduced the profit potential. That at least implies the possibility of some profit.

However, the short answer to this argument is that both section 108 and *Smith* preclude respondent's application of the economic substance test. For section 108 purposes, it does not matter at all that petitioner was arguably in neither a better nor a worse economic position after each of the December 1979 switches. If it does anything, respondent by this argument merely reinforces our conclusion that each new straddle continued to have substantially the same reasonable prospect of profit as did the original straddle. Answer 2 of section 1.165–13T of the temporary regulations provides in pertinent part as follows:[30]

Moreover, in order for section 108 of the Act to apply, the transaction must have sufficient substance to be recognized for Federal income tax purposes. Thus, for example, since a "sham" transaction would not be recognized for tax purposes, section 108 of the act would not apply to such a transaction.

It is not clear from these regulations how respondent defines a transaction with "sufficient substance" so that the transaction would be recognized for Federal income tax purposes. Such language could be construed as adopting the economic substance theory of *Knetsch v. United States, supra,* or as merely adopting the factual sham test of *Julien v. Commissioner,* 82 T.C. 492 (1984), or both. If respondent intended this language to adopt the economic substance theory, it would be inconsistent with section 108 which it purports to interpret. If it merely describes the factual sham test, there is no inconsistency. Section 108 applies only to straddles actually acquired by a taxpayer during the pre-1982 period. If the alleged straddles are in fact fake or fictitious, we would not reach the question of the application of section 108.

When there are at least two constructions of ambiguous language in a regulation, one of which is consistent and one inconsistent with the statute, the regulations should be upheld by adopting that interpretation of the language which is consistent with the intent underlying the statute. *United Telecommunications, Inc. v. Commissioner,* 589 F.2d 1383, 1390 (10th Cir. 1978), affg. 65 T.C. 278 (1975), cert. denied 442 U.S. 917 (1979); *Landerman v. Commissioner,* 454 F.2d 338, 342 (7th Cir. 1971), affg. 54 T.C. 1042 (1970), cert. denied 406 U.S. 967

[30]The complete version of answer 2 of sec. 1.165–13T of the temporary regulations is printed in Appendix B.

(1972), rehearing denied 409 U.S. 903 (1972); see also *Emery Mining Corp. v. Secretary of Labor*, 744 F.2d 1411, 1414 (10th Cir. 1984).[31] Hence, we must interpret the temporary regulations to refer only to factual shams.

Applying section 108 to this record, we conclude that the losses realized on December 3 and 4, 1979, in which the December 1980 short gold position was disposed of are allowable. The new straddle acquired on those dates—15 August 1980 long, 15 October 1980 short—must be tested since on December 13, 1979, petitioner disposed of the 15 October 1980 short position and realized a further loss. Again, and although petitioner concedes that his profit potential was narrowed, there was a reasonable prospect of profit from this straddle. That loss is allowable.[32]

On these facts, we are constrained by section 108 to find for petitioner notwithstanding the fact that this result is directly contrary to our holdings in *Smith* and *Fox*. It is not, however, for this Court to question the wisdom of the congressional mandate.

*Due to concessions made by each party, decision will be entered under Rule 155.*

Reviewed by the Court.

FAY, STERRETT, GOFFE, WILBUR, NIMS, KÖRNER, HAMBLEN, COHEN, and CLAPP, *JJ.*, agree with the majority opinion.

GERBER, *J.*, did not participate in the consideration of this case.

APPENDIX A

Appendix A appears on pages 848 and 849.

---

[31]An appeal in this case would be to the 10th Circuit.

[32]The new butterfly straddle acquired on Dec. 13, 1979, composed of 5 June 1980, 15 August 1980, and 10 December 1980, is not required to be tested in this case since the switch realizing a loss occurred in 1980. However, on the record before us, it is not inappropriate to note that the profit circumstances for this straddle do not appear to differ substantially from petitioner's two other gold straddles discussed in the text.

## Appendix B

Temporary Income Tax Regulations (1.165–13T) relating to straddles entered into before the effective date of the Economic Recovery Tax Act of 1981.

The following questions and answers concern the treatment of losses on certain straddle transactions entered into before the effective date of the Economic Recovery Tax Act of 1981, under the Tax Reform Act of 1984 (98 Stat. 494).

Q-1    What is the scope of section 108 of the Tax Reform Act of 1984 (Act)?

A-1    Section 108 of the Act provides that in the case of any disposition of one or more positions, which were entered into before 1982 and form part of a straddle, and to which the provisions of Title V of The Economic Recovery Act of 1980 (ERTA) do not apply, any loss from such disposition shall be allowed for the taxable year of the disposition if such position is part of a transaction entered into for profit. For purposes of section 108 of the Act, the term "straddle" has the meaning given to such term by section 1092(c) of the Internal Revenue Code of 1954 as in effect on the day after the date of enactment of ERTA; including a straddle all the positions of which are regulated futures contracts (as defined in Q&A-6 of this section). Straddles in certain listed stock options were not covered by ERTA and are not affected by this provision.

Q-2    What transactions are considered entered into for profit?

A-2    A transaction is considered entered into for profit if the transaction is entered into for profit within the meaning of section 165(c)(2) of the Code. In this respect, section 108 of the Act restates existing law applicable to straddle transactions. All the circumstances surrounding the transaction, including the magnitude and timing for entry into, and disposition of, the positions comprising the transaction are relevant in making the determination whether a transaction is considered entered into for profit. Moreover, in order for section 108 of the Act to apply, the transaction must have sufficient substance to be recognized for Federal income tax purposes. Thus, for example, since a "sham" transaction would not be recognized for tax purposes, section 108 of the act would not apply to such a transaction.

## APPENDIX A

### CHART V

**GILBERT R. MILLER**

**GOLD COMMODITY TRANSACTIONS**

**1979 THROUGH 1980**

|  | Contracts | | | | Current balance long/(short) | Gain (loss) claimed on tax return (1) | Calculated unrealized gain (loss) date | Unrealized gain (loss) in account | Net equity in account (2) |
|---|---|---|---|---|---|---|---|---|---|
|  | June 80 | Aug. 80 | Oct. 80 | Dec. 80 | | | | | |
| *1979 Transactions* | | | | | | | | | |
| *Initial transaction* 10/19/79 | | | | | | | | | |
| Trade | | 15 | | (15) | | | | | |
| Position | | 15 | | (15) | 15–(15) | N/A | | 150 | (1,845.00) |
| *First Transaction* 12/3/79 | | | | | | | | | |
| Trade | | | (7) | 7 | | | | | |
| Position | | 15 | (7) | (8) | 15–(15) | (22,340.50) | 12/3/79 | 21,820 | (2,515.50) |
| *Second transaction* 12/4/79 | | | | | | | | | |
| Trade | | | (8) | 8 | | | | | |
| Position | | 15 | (15) | 0 | 15–(15) | (24,012.00) (46,352.50) | 12/4/79 | 36,960 | (11,387.50) |
| *Third transaction* 12/13/79 | | | | | | | | | |
| Trade | (5) | 15 | 15 | (10) | | | | | |
| Position | (5) | 15 | 0 | (10) | 15–(15) | (56,972.50) (103,325.00) | 12/13/79 | 99,100 | (6,220.00) |

|  | Contracts | | | | Current balance long/(short) | Gain (loss) claimed on tax return (1) | Calculated unrealized gain (loss) date | Unrealized gain (loss) in account | Net equity in account (2) |
|---|---|---|---|---|---|---|---|---|---|
|  | June 80 | Aug. 80 | Oct. 80 | Dec. 80 | | | | | |
| **1980 Transactions** | | | | | | | | | |
| *Fourth transaction* 3/7/80 | | | | | | | | | |
| Trade | (5) | 15 | | 5 | | | | | |
| Position | (10) | 15 | 0 | (5) | 15–(15) | (80,207.50) (183,532.50) | 3/7/80 | 159,750 | (25,777.50) |
| *Final transaction* 4/21/80 | | | | | | | | | |
| Trade | 10 | (15) | | 5 | | | | | |
| Position | 0 | 0 | 0 | 0 | 0–(0) | 157,905.00 (25,627.50) | 4/21/80 | | (1)(25,627.50) |

[1]Represents total loss on Gold Transactions—includes $3,447.50 in Commissions and Fees paid.
[2]Includes amounts of commission required to close all positions.

NIMS, *J.*, concurring: I agree with and have joined the majority opinion because I think it correctly and accurately expresses the intent of Congress in the enactment of section 108 of the Tax Reform Act of 1984. I write only to respond to the dissenting opinions filed by Chief Judge Dawson and Judge Simpson.

It was my privilege to express the unanimous views of this Court in *Smith v. Commissioner*, 78 T.C. 350 (1982), where we held, on facts very similar to those now before us, that the taxpayers lacked the requisite profit motive under section 165(c)(2), I.R.C. 1954. That is not to say, however, that there was no reasonable prospect of any profit, small though it might have been. In its report, the Conference Committee expressed its awareness of *Smith*, but as is manifest from the language of the report, the Conference Committee chose to change the test in straddle cases from profit motive to profit potential; i.e., from a subjective to an objective test. In doing so, they unequivocally stated that a reasonable prospect of *any* profit suffices.

If the practical effect in honoring the clearly expressed will of Congress is to grant amnesty to pre-1981 commodity tax straddlers, so be it. It is certainly not the proper function of this or any other Court to subvert the will of Congress by substituting the personal preferences of the Judges, and the majority prudently has not done so.

WILBUR, WHITAKER, HAMBLEN and COHEN, *JJ.*, agree with this concurring opinion.

---

SIMPSON, *J.*, dissenting: The real significance of the issue to be decided by the Court today can be illustrated by figures contained in the congressional debate: reportedly, notices of deficiency have been issued in 15,000 cases involving tax straddles and deficiencies of $1.5 billion. 11 Cong. Rec. S8390 (daily ed. June 27, 1984), and 12 Cong. Rec. E3251–E3252 (daily ed. July 24, 1984). By the enactment of section 108 of the Tax Reform Act of 1984, Congress has clearly indicated that tax relief is to be extended to dealers in tax straddles at a cost of over $300 million in revenue. Based, not on the words of the statute but on a vague sentence in the Conference Committee report, the majority of this Court has decided to interpret

section 108 so as to extend the tax relief to all traders in tax straddles with a cost of $1.5 billion in revenue. These figures illustrate why, as a court, we should not depart from the well-established meaning of the phrase "transaction entered into for profit" without a clear direction by the Congress to do so, and why I must dissent.

Section 108 provides that any loss from the disposition of a position forming part of a straddle entered into before 1982, and to which the amendments made by title V of the Economic Recovery Tax Act of 1981 (ERTA) do not apply, "shall be allowed for the taxable year of the disposition *if such position is part of a transaction entered into for profit.*" (Emphasis added.) The requirement that the loss position be part of a transaction entered into for profit is identical in phraseology to the requirement of section 165(c)(2), which permits an individual to deduct losses "incurred in any transaction entered into for profit." Contrary to the implication contained in the majority opinion at page 838, we were not "forced to interpret this assertedly unambiguous section 165(c)(2) language" for the first time in *Smith v. Commissioner*, 78 T.C. 350 (1982), and *Fox v. Commissioner*, 82 T.C. 1001 (1984); rather, in those cases, we relied on long-established precedent in holding that a "transaction entered into for profit" is, for purposes of section 165(c)(2), a transaction entered into with the predominant or primary hope of deriving an economic profit aside from tax benefits. As we observed in *Fox v. Commissioner, supra* at 1019–1020, the "primary purpose" test first appeared as a judicial gloss on the statutory language of section 165(c)(2) in *Helvering v. National Grocery Co.*, 304 U.S. 282 (1938), where the Supreme Court stated in a footnote that "the deductibility of losses under section 23(e) [the predecessor of section 165(c)(2)] * * * may depend upon whether the taxpayer's motive in entering into the transaction was primarily profit." 304 U.S. at 289 n. 5. The subjective, primary purpose test has since been adopted as the standard to be applied in determining whether a transaction is "entered into for profit" in cases arising under section 165(c)(2) and its predecessor, section 23(e). *King v. United States*, 545 F.2d 700, 708 (10th Cir. 1976); *Austin v. Commissioner*, 298 F.2d 583, 584 (2d Cir. 1962), affg. 35 T.C. 221 (1960); *Knetsch v. United States*, 172 Ct. Cl. 378, 348 F.2d 932, 936 (1965); *Ewing v. Commissioner*, 20 T.C.

216, 233 (1953), affd. 213 F.2d 438 (2d Cir. 1954). Moreover, essentially the same standard has been adopted in determining when an activity is "not engaged in for profit" for purposes of section 183 (sec. 1.183–2(a), Income Tax Regs.; *Fox v. Commissioner*, 80 T.C. 972 (1983), affd. by order 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. *Barnard v. Commissioner*, 731 F.2d 230 (4th Cir. 1984), affd. without published opinions sub nom. *Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner*, 734 F.2d 5–7, 9 (3d Cir. 1984)), and whether a taxpayer is "carrying on any trade or business" under section 162 or is holding property "for the production of income" under section 212 (*Hager v. Commissioner*, 76 T.C. 759 (1981); *Lemmen v. Commissioner*, 77 T.C. 1326 (1981)).

In light of these cases, when Congress used the phrase "transaction entered into for profit" in section 108, its well-established meaning must have been evident to those working with the statute. We must presume that Congress intended such phrase to have the same meaning when used in section 108. *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 87 (1934). Even so, it is still appropriate to examine the legislative history for further evidence of the legislative purposes. *United States v. American Trucking Associations*, 310 U.S. 534, 543–544 (1940). "Nevertheless, where a statute is clear on its face, we would require *unequivocal evidence* of legislative purpose before construing the statute so as to override the plain meaning of the words used therein." *Huntsberry v. Commissioner*, 83 T.C. 742, 747–748 (1984) (emphasis added).

In explanation of the purposes of section 108, the Statement of the Managers provides in relevant part:

The conferees believe it is inappropriate to prolong the uncertainty with respect to the treatment of losses claimed with respect to straddle positions for periods prior to 1981. Accordingly, in lieu of the Senate amendment's requirement of a report with respect to pre-1981 cases, the conference agreement provides that a loss on the disposition of a position entered into before 1982 will be allowed, except to the extent nonrecognition is required under any applicable provision, if the position is part of a transaction entered into for profit. This treatment applies where the position is part of a straddle as defined in section 1092 as in effect on the day after the date of enactment of ERTA (as well as a straddle consisting entirely of RFCs), and is one to which the provisions of Title V of ERTA did not apply. The loss generally will be allowed for the taxable years in which the position is

disposed of. Rules affecting the period within which the loss is recognized, and its treatment as long-term or short-term, such as sec. 1233 or sec. 1234, are to be applied without regard to the fact that the position is part of a straddle.

* * * In determining whether the position is part of a transaction entered into for profit, it is intended that the provision be applied by treating the condition as satisfied if there is a reasonable prospect of any profit from the transaction.

In the case of commodity dealers and persons actively engaged in investing in RFCs, the provision is to be applied by presuming that the position is held as part of a transaction entered into for profit unless the Internal Revenue Service establishes to the contrary. In determining whether a taxpayer is actively engaged in trading in RFCs with an intent to make a profit, a significant factor will be the extent of transaction costs. If they are sufficiently high relatively to the scope of the taxpayer's activities that there is no reasonable possibility of a profit, the presumption will be unavailable.
* * *

[H. Rept. 98–861 (1984), 1984–3 C.B. (Vol. 2) 1, 171.]

The statement reveals that Congress wishes to put an end to the litigation over tax straddles, and to accomplish that end, it adopted two new statutory rules: (1) It rejected the Commissioner's position and provided that the disposition of a loss leg of a straddle constitutes a closed and completed transaction for purposes of section 165(c)(2); and (2) it establishes a rebuttable presumption that any position held by a commodities dealer or any person regularly engaged in investing in regulated futures contracts is part of a transaction entered into for profit. However, there is no clear indication that Congress intended any other changes in pre-ERTA law with respect to straddles. The Conference Committee report does not express dissatisfaction with our decision in *Smith v. Commissioner, supra*; in fact, the committee adopted our conclusion in that case that the disposition of a loss leg is a taxable event. While the committee also adopted a presumption in favor of commodity dealers, it did not expressly overrule our application in *Smith* of the traditional subjective test of primary purpose, insofar as it was applied to "investors with isolated [commodity futures] transactions."

The majority focuses on the phrase "reasonable prospect of any profit" and concludes that such language establishes a new "for profit" test. The majority first examines the words "any profit" and says "The phrase 'any profit,' therefore, requires some prospect for dollar gain over cash investment

plus transaction costs." In connection with "reasonable prospect," the majority states at page 844:

Finally, whether or not the prospect of any profit is reasonable is tested on a facts and circumstances basis in the context of the futures market for the particular commodity at the time the trades are made.

\* \* \* On this record we simply cannot determine whether the prospect for a profit from these straddles in a rising market was a reasonable one. If, however, the market had reversed its course, one of respondent's experts is in agreement with petitioner's expert that profits were foreseeable from these straddles. There is every reason to believe, as we do, that each of the straddles to be tested here had when acquired a reasonable prospect for profit and there is no evidence to the contrary. \* \* \* [Fn. ref. omitted.]

The majority had already concluded that the petitioner's trading strategy was predicated on an assumption that the gold market would rise; yet, the majority declined to inquire as to whether, in such a market, the prospect of profit would be reasonable. Since some experts expected the market to fall, there was the possibility of a profit, and apparently, that possibility was sufficient to convince the majority that there was a "reasonable prospect" of a profit.

Such interpretation is not compelling. The dictionary defines "prospect" as an "act of looking forward; anticipation, foresight." Webster's Third New International Dictionary (1981). Yet, in the statute, "prospect" is modified by "reasonable." It is not enough to anticipate or foresee some profit; that anticipation must be reasonable. We cannot determine the reasonableness of a prospect without some inquiry into the likelihood that it will occur. Can we say that a prospect is reasonable when the petitioner, an experienced trader in commodity futures, his Merrill Lynch advisers, and many market experts expected that it would not occur? The use of "reasonable" reveals that Congress had in mind more than the mere possibility; an unlikely possibility cannot be said to be reasonable. It appears that the majority has totally ignored the requirement of "reasonable" in its interpretation.

Furthermore, if the majority's interpretation is adopted, the presumption contained in section 108(b), which was enacted to provide special relief to dealers in tax straddles, is unnecessary. In virtually every tax straddle, there will exist the possibility of a profit, and therefore, under the majority's interpretation, all traders in tax straddles will receive tax

relief, thereby eliminating the need for a presumption in favor of dealers. In addition, if we conclude that Congress meant to reject the definition of the "for profit" test in *Smith* and *Fox*, other broad and significant questions arise: Is this new "for profit" test to be applied henceforth under section 165(c)(2), and is the new test to be applied for purposes of sections 162, 183, and 212? Surely, if Congress intended to adopt a new provision of law with such broad and pervasive effect, it would have done so in a more conspicuous manner.

Aside from the Statement of the Managers in the Conference Committee report, the managers of the legislation, Chairman Rostenkowski of the Ways and Means Committee and Senator Dole, Chairman of the Finance Committee, offered no further explanation of the scope or effect of section 108. However, Senator Howard Metzenbaum, of Ohio, spoke out about section 108:

the effect of that provision is virtually to preclude the IRS from pursuing tax cases against about 200 traders of commodity futures for an estimated $300 million in taxes that the IRS is trying to collect from traders who used the now outlawed tax avoidance scheme known as a commodity straddle.

As a matter of fact, the IRS preliminary data indicates that there are 4,400 cases presently pending in [the] Tax Court representing $500 million in taxes before interest is assessed. The IRS has assessed deficiencies for 15,000 taxpayers for $1.5 billion. There is no data on how many professional traders are involved, but we do know that whether it is $300 million or $500 million or a substantial amount more, the commodity traders and dealers were well taken care of in the conference committee * * *

[11 Cong. Rec. S8390 (daily ed. June 27, 1984).]

Similarly, Richard L. Ottinger, a Representative from New York, stated on July 24, 1984, that "This tax break [provided by section 108] has been afforded to 200 or so commodity traders in Chicago at a cost of $300 million to the Government." 12 Cong. Rec. E3251 (daily ed. July 24, 1984). Mr. Ottinger also inserted into the Congressional Record an article from the Washington Post of July 2, 1984, in which the author stated that:

Rostenkowski's bailout means that two taxpayers who arranged virtually identical commodity deals to avoid paying taxes will be treated differently.

Ordinary investors will have to show they were trying to make money, not simply create losses to claim as tax deductions. But thanks to Rostenkowski, "professional commodity traders and persons who regularly trade commodity futures contracts" will be presumed to have a profit motive.

In many cases that distinction will mean the brokers who invented this tax dodge will get away with using it, but their clients will have to pay taxes. [12 Cong. Rec. E3251 (daily ed. July 24, 1984).]

These statements by Senator Metzenbaum and Representative Ottinger do reflect the contemporaneous understanding of what Congress was doing by the enactment of section 108. Congress realized that it was extending substantial tax relief to dealers in tax straddles, but these statements make it indisputably clear that Congress had no understanding that it was granting tax relief to all traders in tax straddles with a consequent loss in revenue exceeding $1.5 billion. The outcry by the critics of the legislation would, no doubt, have been substantially greater had they understood that the legislation was extending tax relief to all traders of tax straddles.

Nearly 100 years ago, the Supreme Court observed:

These cases show the principle upon which is founded the rule that a claim for exemption from taxation must be clearly made out. Taxes being the sole means by which sovereignties can maintain their existence, any claim on the part of any one to be exempt from the full payment of his share of taxes on any portion of his property must on that account be clearly defined and founded upon plain language. There must be no doubt or ambiguity in the language used upon which the claim to the exemption is founded. It has been said that a well founded doubt is fatal to the claim; no implication will be indulged in for the purpose of construing the language used as giving the claim for exemption, where such claim is not founded upon the plain and clearly expressed intention of the taxing power. [*Bank of Commerce v. Tennessee*, 161 U.S. 134, 146 (1896).]

Over the intervening years, this proposition has been repeatedly embraced and applied by the Supreme Court. *Bingler v. Johnson*, 394 U.S. 741, 751–752 (1969); *Commissioner v. Jacobson*, 336 U.S. 28, 48–49 (1949); *United States v. Stewart*, 311 U.S. 60, 71 (1940); *Helvering v. Northwest Steel Mills*, 311 U.S. 46, 49 (1940); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934). Here, a trader in tax straddles urges us to construe section 108 so as to allow a deduction for his losses; to allow such losses, we must find that Congress intended by the "reasonable prospect of any profit" sentence to change the well-established meaning of the "for profit" test. In my judgment, that sentence, at most, casts some doubt on the intention of Congress; it certainly does not unequivocally manifest an intention to change the law. Under such circum-

stances, long-established principles of statutory construction should require us to conclude that the traditional "for profit" test is to be applied in this case and that the petitioner is not entitled to deduct his losses.

DAWSON, CHABOT, PARKER, SHIELDS, SWIFT, JACOBS, and WRIGHT, *JJ.*, agree with this dissent.

---

DAWSON, *Chief Judge,* dissenting: I fully agree with Judge Simpson's dissenting opinion. But I have other thoughts and comments.

This case is a prime example of why simplification and reform of our Federal income tax laws are needed.[1] It is also a prime example of unfairness and creates further horizontal and vertical inequities.

If my analysis of the majority opinion is correct, I think the implications of the opinion are startling and wrong. If, as the majority concludes, the scope of section 108 of the Tax Reform Act of 1984 was intended to grant amnesty to all pre-ERTA commodity straddles, then perhaps Mr. Bumble was right.[2] However, I firmly believe that Congress did not intend for section 108 to encompass all pre-ERTA commodity straddles. I am unwilling to attribute such an intent to the conferees of the tax-writing committees and to the members of Congress. The conclusion of the majority here represents a sharp departure from the principle of judicial restraint by relying on murky and gratuitous legislative history which flies in the face of the plain language of the statute. I think we should stay our hand and apply section 108 only to its intended recipients—commodity dealers. By expanding that section beyond its reasonable scope, the majority is basically rewriting the statute. I would refrain from such judicial legislation in the absence of *unequivocal evidence* of legislative purpose to the contrary. The majority's strained construction of section 108 will impede

---

[1] In his radio address on Apr. 13, 1985, the President said the Federal tax system is "a complicated, frustrating, unfair mystery of legalistic gobbledygook and loopholes never designed, it seems, to help everyday wage earners, only those who can afford high-priced attorneys and accountants." To that I would add: Simplification and reform of the Federal tax system are long overdue.

[2] "If the law supposes that," said Mr. Bumble * * * "the law is a ass, a idiot." C. Dickens, Oliver Twist, ch. 51.

the countdown for abusive tax shelters. The result, as I see it, is tax shelter relief run riot.

It is inconceivable to me that, in the Tax Reform Act of 1984, Congress would provide the Internal Revenue Service with new and strong enforcement tools to crack down on abusive tax shelters,[3] and in the same law provide expansive tax relief for all investors in pre-ERTA commodity straddles. Congress also indicated that it expects the Tax Court to impose "without hesitancy in appropriate circumstances the penalties that Congress has provided." See Staff of Joint Comm. on Taxation, General Explanation of Revenue Provisions of the Deficit Reduction Act of 1984, at 485 (Comm. Print 1984). In view of its positive legislative actions to curb the use of abusive tax shelters, I do not believe Congress intended to permit taxpayers, like the petitioner, to reap tax bonanzas with flaky deals that are tax motivated rather than economically motivated.

I dissent because, in my judgment, the majority has chosen a wrong and tortuous path.

CHABOT, PARKER, SHIELDS, SWIFT, and WRIGHT, *JJ.*, agree with this dissent.

---

SWIFT, *J.*, dissenting: The majority opinion holds that losses realized in a straddle transaction will qualify as short-term losses so long as "it can be said" that the transaction offered a prospect of a nominal profit and even though the individual investor entered into the transaction not because of that prospect of a nominal profit but only for the likely tax losses to be generated therefrom. Under this test, an individual investor's motive in entering into a particular straddle transaction is rendered irrelevant and immaterial. This change in the law (which focuses on what *may* occur in the marketplace to *any* investor and which disregards the specific motive of the individual investor who entered into the particular transac-

---

[3]See, for example, the following compliance provisions of the Tax Reform Act of 1984 with respect to tax shelters: (1) Sec. 141 relating to the registration of tax shelters; (2) sec. 142 requiring promoter lists; (3) sec. 143 increasing the penalty for promoting abusive tax shelters and providing for injunctions against aiding and abetting the understatement of tax liability; and (4) sec. 144 increasing the rate of interest for tax-motivated transactions. It is significant that a "tax motivated transaction" includes "any straddle." The majority opinion in this case acknowledges that "petitioner's gold trades here in issue were primarily tax motivated."

tion in question) is directly contrary to the express language of section 108 and, in my opinion, is incorrect.

As we recently stated—

The starting point for interpreting a statute is the language of the statute itself. E.g., *Rosewell v. LaSalle National Bank*, 450 U.S. 503, 512 (1981); *Consumer Product Safety Commission v. GTE Sylvania*, 447 U.S. 102, 108 (1980). Absent a clearly expressed legislative intention to the contrary, the language of a statute ordinarily must be regarded as conclusive. E.g., *United States v. Turkette*, 452 U.S. 576, 580 (1981); *Consumer Product Safety Commission v. GTE Sylvania, supra* at 108. * * * [*Tamarisk Country Club v. Commissioner*, 84 T.C. 756 (1985).]

Thus, in considering herein the interpretation and significance to be given the relevant language from the Conference Committee report, the question should be asked whether the apparent focus of that language on what may happen in the marketplace (as distinct from the focus of the statutory language on the individual investor's specific motive in entering into a particular straddle transaction) represents such a significant departure from the statutory language that the language of the Conference Committee report must be disregarded absent a clearer and unequivocal statement from Congress that that departure was intended.

For the reasons set forth herein, and in the dissenting opinions of Chief Judge Dawson and Judge Simpson, I respectfully dissent.

DAWSON, CHABOT, PARKER, and SHIELDS, *JJ.*, agree with this dissent.