IVAN K. LANDRETH and LUCILLE LANDRETH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Landreth v. Commissioner
Docket No. 4432-83.
United States Tax Court
T.C. Memo 1985-413; 1985 Tax Ct. Memo LEXIS 225; 50 T.C.M. (CCH) 728; T.C.M. (RIA) 85413; August 12, 1985. Robert J. Shaw and Paul R. Cressman, Jr., for the petitioners. Theodore J. Kletnick and Gary Kirschenbaum, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1978 in the amount of $132,468. The issues for decision are (1) whether petitioners are entitled to deduct losses from trading in gold commodity futures straddles for the year 1978 in the amount of $369,400 and losses in that year from trading in U.S. Treasury bills (T-bills) futures straddles in the amount of $48,034; and (2) whether legal fees and related expenses incurred and paid by petitioners in connection with the rescission litigation involving the sale of stock of a sawmill may be deducted in 1978 as capital expenses or must be deducted in the years incurred and paid. FINDINGS OF FACT Some of the facts have been stipulated and all stipulated facts are found accordingly.We will set forth herein only those stipulated facts that we consider necessary to an understanding of our conclusions. Petitioners, husband and wife, who resided in Redmond, Washington, at *227 the time of the filing of the petition in this case, filed a joint Federal income tax return for the calendar year 1978 with the office of the Internal Revenue Service at Ogden, Utah. Petitioners' tax return for the calendar year 1978 and their returns for all periods relevant to this case were prepared on the cash receipts and disbursements method of accounting. Ivan K. Landreth (petitioner) graduated from high school in 1933 and since that date, except for a period of approximately 9 years from 1945 to 1954, has been engaged in the lumber and sawmill business. In 1954 petitioner acquired the stock of a sawmill. He continued to operate this sawmill until 1977. On October 6, 1977, petitioners entered into a contract to sell their 76 percent stock interest in the Landreth Timber Co., Inc., a Washington corporation (the sawmill). This stock was held by petitioners as community property. Petitioners' sons, Ivan Landreth, Jr., and Theodore Landreth, each owned 12 percent of the outstanding stock of Landreth Timber Co., Inc. They were also parties to the contract for the sale of the sawmill stock. When petitioner signed the contract for the sale of the stock in October 1977, he *228 did not anticipate any difficulty or litigation concerning the contract. The purchase price of the stock was $3 million, to be paid $750,000 cash on November 16, 1977, and $2,250,000 on January 10, 1978. Between the closing of the contract on November 16, 1977, and January 4, 1978, differences arose between the parties with respect to the contract of sale. On January 4, 1978, a schedule of the differences between the parties was prepared by the purchasers and delivered to petitioners. At the time the differences amounted to $176,378. For their 76 percent stock interest petitioners received $532,000 cash in 1977 and $1,520,000 in 1978, making a total of $2,052,000. Throughout 1978 negotiations and correspondence between petitioners and the purchasers continued, and on November 1, 1978, an action for rescission and damages was filed by the purchasers in the United States District Court for the Western District of Washington seeking to rescind the sales agreement. At the time this lawsuit was commenced petitioners anticipated that they would incur substantial legal expenses in 1979 and later years in connection with the lawsuit. The lawsuit against petitioners and others in the *229 District Court was dismissed in favor of petitioners in the spring of 1982, and this dismissal was affirmed by the United States Court of Appeals for the Ninth Circuit in 1984. A similar action was filed in a state court of the State of Washington by the purchasers of the sawmill stock and that action is still pending. In December 1978, petitioners were hopeful of negotiating a settlement of the lawsuit. During the years 1978 through 1982, petitioners paid legal and related expenses in connection with the rescission litigation in the following amounts: 1978
$ 1,379
1979
164,716
1980
165,332
1981
139,850
1982
85,025
Total
[1] $556,302
Prior to the year here in issues petitioner had invested occasionally in stocks and bonds and certificates of deposit and had some knowledge of commodity prices as a result of his sawmill business. During most of this time and during the year here in issue, petitioner's *230 account executive at Merrill Lynch Pierce Fenner & Smith (Merrill Lynch) where he did his stock market trading was David A. Raymond, who was in Merrill Lynch's Seattle, Washington, office. Mr. Raymond was not very familiar with commodity straddles. In the latter part of 1978, Mr. Raymond introduced petitioner to Jack Karczewski, a commodities account executive employed by Merrill Lynch at its Seattle office. Mr. Karczewski was the head of the commodities department for the Merrill Lynch Seattle office. Before Mr. Raymond introduced petitioner to Mr. Karczewski, he informed Mr. Karczewski of petitioner's financial background and told Mr. Karczewski that petitioner had sold his stock in his sawmill and had a substantial long-term capital gain. The meeting between Mr. Karczewski and petitioner was set up to enable the two to discuss the possibility of deferring taxes on petitioner's gain from the sale of the sawmill stock to a later year. Thereafter petitioner and Mr. Karczewski met approximately two or three times before petitioner entered into any straddle transactions. Also at one of the meetings petitioner's son, Theodore Landreth, was present. Mr. Karczewski, spent approximately *231 half of the time at the meetings he had with petitioner discussing the tax ramifications of commodity straddles and the other half of the time discussing the basics of commodity trading. After the meeting between petitioner and Mr. Karczewski, Mr. Raymond sent a letter to petitioner's son, Theodore Landreth, summarizing in effect the presentation made to petitioner and defining the risks of straddle trading as being (1) the possiblity that a long-term capital gain could be converted to a short-term capital gain, (2) an Internal Revenue Service audit, (3) insufficient market movement to achieve the tax objective, and (4) some economic loss. Mr. Karczewski expected that in the trades that would be suggested for petitioner there would be a gain or a loss of no more than $15,000 from the straddle transactions. A straddle or spread essentially involves the purchase of a commodity futures contract requiring delivery in one month and the concurrent sale of a futures contract requiring delivery of the same commodity in a different calendar month. Economic gain or loss on such a position is not based upon absolute price movements but rather is measured by the increase or decrease in the *232 price differential between the two contracts. Thus the potential for gain or loss in a straddle transaction is a function of the change in the price relationship or differential between the different delivery months. If the difference in price between months remains stable, any price movement in the underlying commodity will produce an unrealized gain in one position and an offsetting loss of approximately the same amount in the other position. Commodity straddles can be traded for business reasons or to speculate in the anticipated change in the price relationship between the different delivery months. The use of commodity straddles has also been advocated by some persons as a means of obtaining certain tax benefits, including deferral of tax on short-term capital gains, from one taxable year to a subsequent year and attempting to convert short-term capital gains realized in the first year to long-term capital gains in the second year. During 1973, Merrill Lynch had a unit within its commodity division commonly referred to as the Tax Straddle Department. Some time subsequent to May 1977, the name "Tax Straddle Department" was no longer utilized by this unti, although some persons *233 within the Merrill Lynch organization continued to refer to the department by that name. Tom O'Hare was the manager of this unit (the commodity straddle unit) from 1971 through 1981. The commodity straddle unit had three employees, including Mr. O'Hare. In addition to Mr. O'Hare, these employees were Ray Shevlin and a secretary/clearical employee. Account executives of Merrill Lynch were informed of the work done by Mr. O'Hare and Mr. Shevlin in the commodity straddle unit and were from time to time given seminars on the work this unit did.Thses seminars included a tape which outlined the tax advantages and some of the risks involved in tax straddles where a specific tax objective was sought by a taxpayer. Merrill Lynch account executives customarily maintained worksheets to plan clients' transactions which were referred to as holding pages. The commodity straddle unit completed holding pages for its straddle clients. On these holding pages maintained by the commodity straddle unit the tax objective of an individual would be shown. Mr. Karczewski, after discussing with petitioner the use of commodity straddles to shift some of his capital gains from 1978 to later years, got *234 in touch with Mr. Shelvin of the commodity straddle unit of Merrill Lynch and Mr. Shelvin made out a holding page for petitioner. This holding page shows as the objective of petitioner "450M" which indicated that the objective of the straddle was to move $450,000 from 1978 to a later year by recognizing a short-term capital loss of $450,000 in 1978. Another designation on the holding page was "description," under which was placed the type of commodity future and the month traded.There was a record of bought and sold and spaces to show transactions in the current year and the following year. There was a place to show the gain or loss on the overall transaction prior to commission, the commission, and the gain or loss after commission. Petitioners in later 1978 opened a new commodity account with the Seattle office of Merrill Lynch. In connection with the opening of this account petitioners were given a risk disclosure statement and petitioners signed a commodity account agreement. Petitioners' file at Merrill Lynch's Seattle office also contained copies of telexes from Mr. Karzcewski to Mr. Shelvin in regard to petitioners' account dated December 7, 1978, and December 8, 1978, and *235 telexes from the Seattle office to the New York office in regard to petitioners' account dated December 28, 1978, and January 3, 1979. Petitioners' gold futures straddle transactions executed between December 8, 1978, and June 21, 1979, were implemented by the Merrill Lynch commodity straddle unit in New York. Petitioners' T-bills futures transactions executed between December 8, 1978, and March 15, 1979, were implemented by Mr. Karzcewski from the Seattle office of Merrill Lynch. On December 8, 1978, petitioners initiated a series of gold futures straddle trades that continued until June 21, 1979. Throughout this series of transactions petitioners maintained a balanced position, i.e., an equal number of long and short contracts, although the long and short contracts were for different delivery months. In summary, petitioners' gold futures straddle trades were as follows: On December 8, 1978, petitioners acquired 150 short April 1980 gold futures contracts and 150 long June 1980 gold futures contracts. On December 18, 1978, petitioners acquired 50 short February 1980 gold futures contracts, 150 long April 1980 gold futures contracts (thereby closing out their April 1980 position), *236 and 100 short August 1980 gold futures contracts. On December 27, 1978, petitioners acquired 50 long February 1980 gold futures contracts (thereby closing out their February 1980 position), 150 short April 1980 gold futures contracts, and 100 long August 1980 gold futures contracts (thereby closing out their August 1980 position). On February 28, 1979, petitioners acquired 50 long April 1980 gold futures contracts (thereby closing out 50 of their then existing 150 short April 1980 gold futures contracts), and acquired 50 short August 1980 gold futures contracts. During the period June 11 through June 21, 1979, petitioners closed out their gold futures straddle transactions by purchasing 100 long April 1980 gold futures contracts, selling 150 long June 1980 gold futures contracts and purchasing 50 long August 1980 gold futures contracts. The net result of petitioners' gold futures straddle transactions was a gain prior to commissions of $8,274 and commissions on the transactions of $21,450, with a loss after commissions of $13,176. For the year 1978, the result of petitioners' commodity trades in gold futures was a loss of $369,400. The following schedule shows the various trade *237 dates, contracts, and amounts of gain or loss, including commissions, resulting in the net loss after commission of $13,176 with respect to petitioners' gold futures transactions from December 1978 to June 21, 1979: Trade Dates
Contracts
Amounts
12/18/78
150 April 80
($211,950)
12/29/78
50 February 80
( 52,150)
12/29/78
100 August 80
( 105,300)
2/28/79
50 April 80
( 137,740)
6/11/79
42 April 80
( 210,966)
6/11/79
42 June 80
313,194 6/12/79
16 April 80
( 73,488)
6/12/79
16 June 80
110,296 6/13/79
14 April 80
( 51,183)
6/13/79
14 June 80
76,637 6/14/79
17 April 80
( 93,740)
6/14/79
17 June 80
140,190 6/15/79
11 April 80
( 52,173)
6/15/79
11 June 80
77,737 6/18/79
13 August 80
( 22,399)
6/18/79
13 June 80
89,531 6/21/79
37 August 80
( 86,321)
6/21/79
37 June 80
( 276,649)
NET GAIN OR (LOSS)
($ 13,176)
At various times between January 1979 and June 21, 1979, petitioners could have closed out their gold futures contracts so that the overall result of the transactions would have been a profit after payment of commissions. On December 8, 1978, petitioners also initiated *238 a series of T-bills futures straddle trades that continued until March 15, 1979. Throughout the series of T-bills futures trades, petitioners maintained a balanced position. On December 12, 1978, petitioners acquired 50 short March 1980 T-bills futures contracts and 50 long June 1980 T-bills futures contracts. On December 19, 1978, petitioners sold 50 long June 1980 T-bills futures contracts (thereby closing out their June 1980 position) and acquired 50 long September 1980 T-bills futures contracts. On February 14, 1979, petitioners purchased 25 long June 1980 T-bills futures contracts and sold 25 long September 1980 T-bills futures contracts (thereby closing out 25 of their 50 September 1980 T-bills futures contracts). On February 16, 1979, petitioners acquired 25 long December 1979 T-bills futures contracts and sold 25 long September 1980 T-bills futures contracts (thereby closing out the remainder of their September 1980 T-bills futures contracts). On March 15, 1979, petitioners acquired 25 short December 1979 T-bills futures contracts, 50 long March 1980 T-bills futures contracts, and 25 short June 1980 T-bills futures contracts. These transactions closed out all petitioners' *239 T-bills futures contracts. In the year 1978, in closing out one leg of the straddle, petitioners had a short-term capital loss on the T-bills futures contracts of $48,034. As an overall result of these transactions, petitioners sustained a net loss after commissions of $13,750, comprised of the following: Trade Dates
Contracts
Amounts
12/19/78
50 June 80
($48,034)
2/14/79
25 September 80
( 7,109)
2/16/79
25 September 80
( 7,925)
2/26/79
Commission Adjustment
550 3/15/79
25 December 79
( 1,000)
3/15/79
50 March 80
49,250 3/15/79
25 June 80
( 1,550)
3/16/79
Adjustment
550 12/19/79
Adjustment
1,034 NET GAIN OR (LOSS)
($13,750)
The net loss of $13,750 consists of commissions in the amount of $8,000 and a difference loss in trading of $5,750. During the years 1978 and 1979 petitioners also traded in lumber and plywood futures. In the year 1978 petitioners had a net loss in lumber futures of $3,510 and plywood futures of $2,463, and in 1979 they had a gain from transactions in lumber and plywood futures contracts in excess of the 1978 and 1979 losses. Petitioners' gold and T-bills straddles followed the *240 typical straddle positions suggestd by Merrill Lynch of establishing a straddle position, a switch in the year that position is established to realize a loss for tax purposes and a closeout of the straddle in the following year. In a gold straddle situation, if a person expected a rise in short-term interest rates and wished to profit from such rise, that person would sell the nearby futures months and buy the distant futures months. If a person were correct in his expectation as to a rise in short-term interest rates, this type transaction could result in some profit after commissions. If a person expected a rise in short-term interest rates and wished to profit from such rise by using T-bills straddles, the person would purchase the nearby month and sell the distant month. The profit potential on gold straddles and T-bills straddles, after considering commission costs, is relatively small compared to the dollar amount of contracts purchased but can be significant as compared to the margin an individual is required to keep with the brokerage firm in order to participate in commodity futures straddle transactions. The percent of traders making profits in straddle transactions, *241 as is true in many commodity transactions, is relatively small. However, there are individuals who realize profits from commodity straddle transactions. In fact, Theodore Landreth, petitioners' son, did realize an overall profit after commissions from his participation in commodity futures straddle transactions in 1978 and 1979. Petitioners, on their Federal income tax return for the calendar year 1978, reported a net long-term capital gain of $980,047, which was composed of long-term capital gains from an installment sale of the sawmill stock of $1,418,008 and short-term capital losses of $438,182. Included in the short-term capital losses was a short-term capital loss from trading in gold commodity futures of $369,400 and a short-term capital loss from trading in T-bills futures of $48,034, which were disallowed by respondent in the notice of deficiency with the following explanation, insofar as here pertinent: such transactions do not represent a sufficient change in economic position to justify recognition for tax purposes, of the losses or gains as claimed. * * * It is also determined that none of the losses claimed by you in connection with such transactions (whether *242 capital or ordinary), is deductible under Section 165 [2] of the Internal Revenue Code, because you have not established that such losses were bona fide, or that the transactions were entered into for profit within the meaning of that section, but on the contrary it would appear that they were entered into solely or primarily to reduce income taxes by converting short term or ordinary income to capital gain, and defer reporting the same. Petitioners, by their petition, alleged that in addition to the $1,379 legal expenses paid and claimed as a capital expenditure in the year 1978, they should be allowed to deduct as a capital loss the $164,716, $165,332, $139,850, and $85,025 of legal and related expenses paid in the years 1979, 1980, 1981, and 1982, respectively, in connection with the suit for rescission of the contract for sale of the sawmill stock so that these expenses would reduce their 1978 reported long-term capital gain from this sale. Respondent takes the position that the legal and related expenses *243 in connection with the rescission suit are deductible as capital expenditures only in the years in which incurred and paid. OPINION Based on the facts in this record, we conclude, despite the testimony of petitioner and various individuals who assisted him in placing the straddle transactions involved to the contrary, that petitioner's motive in entering into the straddle transactions was to generate losses for tax purposes in the year 1978 to offset a part of his capital gains in that year and not a motive to make a profit from the transactions themselves. We do not doubt that petitioner preferred and hoped for an economic profit from the transactions as well as the tax losses to be generated. There were changes in the laws between 1978 and 1979 with respect to the taxation of capital gains, and we are confident petitioner was aware of the more advantageous laws applicable to 1979 by late 1978. Petitioner's motive in the straddle was to move as much as feasible of his capital gain from the sale of his sawmill stock from 1978 to 1979 to effect a substantial tax saving. Therefore, under our holding in Smith v. Commissioner,78 T.C. 350 (1982), we would conclude, *244 as we did in that case, that petitioners did not have the subjective intent of a nontax profit and that the evidence here, as in the Smith, case, belies any nontax motive on petitioners' part. 78 T.C. at 391. Clearly, any profit motive petitioners in this case had was merely incidental and was not the primary purpose of the transactions. Therefore, under our holding in Fox v. Commissioner,82 T.C. 1001 (1984), we would conclude that any profit motive on petitioners' part was merely incidental and would not suffice to establish that the transactions were entered into for profit within the meaning of section 165(c)(2). However, this case is controlled by our decision in Miller v. Commissioner,84 T.C. 827 (1985), in which we held that under section 108, which is applicable to the year here involved, the question to be determined is whether the straddles entered into by petitioner had a reasonable prospect of any profit in the then existing market. Based on the evidence in this record, it is clear, and in fact there is no evidence to the *245 contrary, that each of the straddles entered into by petitioners had a reasonable prospect for some profit at the time they were acquired. Certain witnesses for petitioners testified that there was sufficient prospect of profit as compared to the margin petitioners were required to put up to interest an investor in the transactions from purely a profit motive. Respondent's expert testified that there was a small profit potential in the straddle transactions entered into by petitioners but not a sufficient profit potential compared to the large losses generated for tax purposes to conclude that any prospect of profit was the motivation of petitioners in entering into the transactions. In the Miller case we stated that-- The phrase "any profit," therefore, requires some prospect for dollar gain over cash investment plus transaction costs. * * * the profit potential need not equate with, relate to or exceed some arbitrary percentage of the investment, whether investment is defined as the total initial margin, the aggregate margin cost, the face value of any single position acquired or *246 the aggregate face value of all of the positions comprising the straddle determined as of the date acquired. * * * [84 T.C. at 843-844.] In the Miller case we pointed out that whether or not the prospect of any profit is reasonable is to be determined on a facts and circumstances basis. in Miller we discussed in some detail our interpretation of the provisions of section 108. In our view the instant case is indistinguishable from the Miller case and, therefore, based on our analysis of section 108 in that case, we conclude here, as we did there, that there was indeed a reasonable prospect of some profit from the straddle transactions entered into by petitioners at the time the positions were acquired. We hold here for the reasons stated in detail in the Miller, case, including the legislative history of section 108, that-- Section 108 adopts an objective test and directs that losses be allowed on the disposition of a position if that particular straddle transaction can be said to have held "a reasonable prospect of any profit" at the time the straddle *247 was acquired.[84 T.C. at 842.] In Miller we held that respondent's temporary regulations to the contrary, which would apply the same standard as applied in section 165(a), are plainly inconsistent with section 108 as construed in accordance with this legislative history and that the regulations, insofar as they adopt the Smith and Fox test, are invalid. We follow that holding in this case. It is unnecessary for us to state fully herein the reasons which we outlined in detail in the Miller case. Rather, we here base our conclusion on the reasons stated in detail in the Miller case. Respondent argues here, as he did in the Miller case, on the authority of Knetsch v. United States,364 U.S. 361 (1960), and similar cases, that there is no economic substance to petitioners' gold straddle trades and T-bills straddle trades. We disagree with respondent's contention in this regard for the same reasons stated in the Miller case. Here, as in the Miller case, we accept the validity of the opinion of respondent's expert that the potential for gain in the type of straddles entered into by petitioners was not sufficient *248 to have attracted an individual who was profit-motivated as distinguished from tax saving-motivated. We also agree that the facts here show that a person speculating in commodity futures with the hope of a large profit would not have entered into the type of transactions entered into by petitioners. However, as we pointed out in the Smith case, the fact that one of a taxpayer's motives or even the fact that the primary motive was tax saving does not cause a transaction which is in fact a substantive transaction to lack economic substance. Clearly, also, section 108, which requires only that there be a reasonable prospect of "any profit" from the transaction, precludes a conclusion that a transaction shown, as is the case here, to have a reasonable prospect of some profit be held to lack economic substance. Respondent here does not argue that the transactions of petitioners in gold commodity futures and T-bills commodity futures were shams. In fact, respondent in his brief states that he makes no contention that the trades here involved were prearranged, rigged, or manipulative and *249 recognizes that under the facts here the transactions are not "shams." His contention in this case is only that these transactions do not possess the minimal transactional substance which is a prerequisite to recognition for Federal income tax purposes. We therefore conclude here, as we did in the Miller case, that since on the basis of this record it is clear that in the gold straddle transactions and the T-bills straddle transactions there was a reasonable possibility of some profit, although small, the transactions were not lacking in economic substance. Applying section 108 to the facts contained in this record, we conclude that in December 1978 petitioners' gold commodity transactions and T-bills commodity transactions had a reasonable prospect of some profit from the overall transactions of the straddles and for this reason the claimed 1978 losses are allowed. Petitioners take the position that since on January 10, 1978, when they received proceeds of approximately $1,500,000 from the sale of the sawmill stock, they signed an amended agreement confirming the fact that the purchasers were not waiving any claim for damages, they, in effect, received the amount in 1978 *250 subject to a claim by the purchasers for damages. It is petitioners' position that the amount of that claim was speculative and not subject to evaluation and therefore they should be entitled to deduct in 1978 the legal fees and related costs which eventually in later years were paid in connection with the rescission suit. Petitioners recognize and state that they have been unable to find any cases dealing with a factual situation comparable to that here present. However, they rely on the rationale of Underhill v. Commissioner,45 T.C. 489 (1966), as supporting their position. In our view the facts in Underhill are so different from those in the instant case that there is no basis for applying the rationale of that case to the situation here. However, the circumstances considered in the Underhill case in reaching the conclusion we reached, that certain notes were speculative and therefore a cost recovery basis of reporting income was proper, would clearly be inapplicable to the payment actually received by petitioners in the instant case. Here, petitioners had in fact received the $1,500,000 payment in 1978 and the only speculative situation at the end *251 of that year or during the subsequent years was whether petitioners might be required to return part or all of that amount to the purchasers.As is recognized in the Underhill case and other cases too numerous for citation, the Federal income tax system is predicated upon the theory of annual accounting. 45 T.C. at 493. As we pointed out in the Underhill case, a taxpayer must compute his taxable income on the basis of an annual accounting period even though his calculation of gain will not always be the ultimate gain because of subsequently occurring events affecting the transaction involved. In this case, petitioners reported their income on a cash receipts and disbursements basis of accounting. Therefore, as a general matter they would be expected to report income received in the year received and claim deductions in the year the amounts are paid. See section 461(a) and section 1.461-1(a)(1), Income Tax Regs. See also, Arrowsmith v. Commissioner,344 U.S. 6 (1952). As has been pointed out on numerous occasions, both the *252 Government and the taxpayer are denied the privilege of allocating income or outgo to a year other than the year of actual receipt or payment, and this basic principle should not be changed merely because it is of advantage to either a taxpayer or the Government in a particular case for a different rule to be followed. Healy v. Commissioner,345 U.S. 278, 284 (1953); Security Flour Mills Co. v. Commissioner,321 U.S. 281, 286 (1944). Although we have not had called to our attention nor located any case with exactly the same facts as the instant case, the principles enunciated in many cases with respect to the yearly accounting period leads us to the conclusion here that the legal fees and related expenses paid by petitioners in years subsequent to 1978 are properly deductible as capital expenditures in the year in which paid and not in the year 1978. [3]
*253 We therefore hold that petitioners are not entitled to deduct in the year 1978 as capital losses or expenditures the attorneys' fees and related costs paid in subsequent years in connection with the litigation to rescind the sales contract of the sawmill stock. Decision will be entered under Rule 155.
Footnotes
1. The $556,302 consists of $536,302 of legal expenses and $20,000 of commissions relating to the sale of the sawmill. The parties agree that these expenses are deductible as long-term capital losses, but dispute the year in which the losses should be deducted.↩
2. Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the year here in issue.↩
3. The case most nearly resembling this case to which our attention has been directed is Harchester Realty Corp. v. Commissioner, T.E.Memo. 1961-184, in which we held that expenses paid by a taxpayer in 1954 and 1955 with respect to the sale of real estate in 1952 and 1953 were to be treated as capital losses in the years in which paid and not to be treated as expenses of sale in 1952 and 1953 to reduce the gain on the sale reported in the years when the sales were made. In that case we based our conclusion on the annual accounting of income requirements of the tax laws and various cases discussing this requirement, including Healy v. Commissioner,345 U.S. 278 (1953), and Security Flour Mills Co. v. Commissioner,321 U.S. 281↩ (1944).