**William F. WEHRLY and Elizabeth Ann Wehrly, Plaintiffs/Appellants,**

v.

**UNITED STATES of America, Defendant/Appellee.**

No. 84–3945.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 3, 1985.

Decided June 20, 1986.

Joseph Wetzel, Mary K. Hickman, Wetzel & DeFrang, Portland, Or., for plaintiffs/appellants.

Richard Ferber, Farley P. Katz, Dept. of Justice, Washington, D.C., for defendant/appellee.

Before FLETCHER and BOOCHEVER, Circuit Judges, and AGUILAR, District Judge.*

BOOCHEVER, Circuit Judge:

The Wehrlys appeal the denial of a tax refund relating to straddle investments in forward contracts for government mortgage certificates. The court instructed the jury that losses on one leg of the straddle were deductible under Internal Revenue Code § 165(c)(2), 26 U.S.C. § 165(c)(2) (1982), only if the Wehrlys' primary motive for entering into the transactions was to make a profit.

We reverse and remand, holding that the retroactive "for profit" language of section 108 of the Deficit Reduction Act of 1984, Pub.L. No. 98–369, 98 Stat. 494, 630–31, requires the investor to have only a reasonable expectation of a profit. Profit must be a motive but not necessarily the primary motive for entering into a transaction.

## FACTS

In 1979, the Wehrlys invested $2,000 in forward contracts to buy and sell government-guaranteed mortgage securities. Their investment was a straddle; they simultaneously entered into contracts to buy and sell equal amounts of securities from the same party, Gregory Government Securities (GGS).[1] GGS issued a prospectus and made in-person presentations to the Wehrlys and others to promote these investments. The prospectus discussed the market risks of the investment briefly but dealt extensively with the potential tax consequences. The prospectus stated that investors could change positions (close out one or both legs of the straddle) to realize gains or losses as interest rates rose or fell. To change position the contract was cancelled and the investor would "owe" GGS the amount of any loss.

GGS had sole discretion to set the price of the securities involved in the contracts and investors signed a power of attorney authorizing GGS to make trades on their behalf. The contracts were not traded on any exchange.

Interest rates on government securities went up immediately after the Wehrlys paid their $2,000. This change increased the value of the Wehrlys' contracts to sell, but decreased the value of their contracts to buy.

Fifteen days after the original contracts were executed, GGS cancelled the buy contracts. GGS calculated the decrease in value of the securities covered by the contracts at the time of cancellation, and recorded that amount on its books as a debt

---

* Honorable Robert P. Aguilar, United States District Judge for the Northern District of California, sitting by designation.

1. A more extensive discussion of straddle investments may be found in *Brown v. Commissioner*, 85 T.C. (P–H) 536 (1985), and *Miller v. Commissioner*, 84 T.C. 827 (1985).

owed by the Wehrlys. The Wehrlys' "debt" was $20,621. They did not pay any portion of the debt in 1979, but deducted it on their tax return as a loss resulting from a transaction entered into for profit under section 165(c)(2).

The Wehrlys entered into a series of contracts ("lockdowns") with GGS which had the effect of ensuring that their gain position or the sell contracts would hold steady. GGS returned the Wehrlys' $2,000 deposit three weeks after the cancellation, allegedly because the equity in their GGS gain position was sufficient collateral for their $20,000 debt.

Several years later, in 1981, the Wehrlys told GGS to assign their "gain" position. GGS assigned to RST Investment Company (RST), a partnership which reassigned virtually all contracts it received back to GGS within several days.

By assigning their contracts, the Wehrlys realized the gain leg of their investment and reported on their tax return a $20,621 long-term capital gain. GGS calculated that when the Wehrlys' assignment "gains" were set against their 1979 cancellation "losses" and fees, GGS owed the Wehrlys $381. GGS paid this sum directly to the Wehrlys.

At trial, the government introduced evidence that between 1979 and 1981 GGS had over 1000 accounts similar to the Wehrlys'. In virtually every case the transactions followed the same pattern: an initial deposit on straddle contracts, the cancellation of one leg for a loss, the subsequent entry into lockdown contracts, and the assignment of the gain leg of the contracts in a later tax year. In 1979, every GGS customer claimed a ten to one loss on the cancelled leg of the straddle regardless of the interest rate predicted. All assignments of the gain leg were to RST, and RST transferred all contracts back to GGS within several days of assignment. RST received a flat fee of $100 for each assignment, regardless of the face value of the securities assigned. A GGS employee testified that no GGS contract ever resulted in delivery of the underlying securities.

The Wehrlys requested a jury instruction that a loss is deductible under section 165(c)(2) so long as the taxpayer had a genuine profit motive in entering a transaction, even if the dominant motive were tax savings. The district court refused this instruction, and instead instructed the jury that section 165(c)(2) requires that a taxpayer's primary motive be profit. The jury found for the government.

## ANALYSIS

The interpretation of section 165(c)(2) and of the retroactive straddle provisions of the Deficit Reduction Act are questions of law which we review de novo. *Bolaris v. Commissioner*, 776 F.2d 1428, 1431 (9th Cir.1985).

Section 108 of the Deficit Reduction Act of 1984, Pub.L. No. 98–369, 98 Stat. 494, 630–31, provides in part:

> (a) GENERAL RULE.—For purposes of the Internal Revenue Code of 1954, in the case of any disposition of 1 or more positions—
>
> > (1) which were entered into before 1982 and form a part of a straddle, and
> >
> > (2) to which the amendments made by title V of the Economic Recovery Tax Act of 1981 do not apply,
>
> any loss from such disposition shall be allowed for the taxable year of the disposition *if such position is part of a transaction entered into for profit.* (emphasis added).

Thus, the losses incurred are to be allowed for the year 1979 if they were "part of a transaction entered into for profit."

The critical phrase—"transaction entered into for profit"—is identical with the language of section 165(c)(2), which has been interpreted to require for a loss deduction that the primary motive for entering the transaction must be profit. *See, e.g. United States v. Generes*, 405 U.S. 93, 105, 92 S.Ct. 827, 834, 31 L.Ed.2d 62 (1972) (dictum); *Helvering v. National Grocery Co.*, 304 U.S. 282, 289 n. 5, 58 S.Ct. 932, 936 n. 5, 82 L.Ed. 1346 (1938) (dictum); *Fox v. Commissioner*, 82 T.C. 1001, 1018–21

(1984). Prior construction by courts of similar statutory language used in a new statute is one means of divining congressional intent. *Cf. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 378–82, 102 S.Ct. 1825, 1839–41, 72 L.Ed.2d 182 (1982); *see generally* N. Singer, 2A *Sutherland Statutory Construction* § 49.-09 (rev'd 4th ed. 1984). As we explained in *Conforte v. Commissioner,* 692 F.2d 587 (9th Cir.1982), however,

> [w]e ... do not exclude the possibility that the same word[s] could have a different meaning in different parts of the code. The legislative intent must govern this definitional process.

692 F.2d at 591. *See also Tahoe Regional Planning Agency v. McKay,* 769 F.2d 534, 537 n. 5 (9th Cir.1985) (open meeting statutes containing essentially identical provisions have been construed differently).

We realize that if the statutory language of section 108 unambiguously favored the government's interpretation, that language would be regarded as conclusive, and legislative history ordinarily could not be used to interpret the meaning of the phrase. *Dickerson v. New Banner Institute, Inc.,* 460 U.S. 103, 110, 103 S.Ct. 986, 990, 74 L.Ed.2d 845 (1983); *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981); *Rivera v. Becerra,* 714 F.2d 887, 893 (9th Cir.1983), *cert. denied,* 465 U.S. 1099, 104 S.Ct. 1591, 80 L.Ed.2d 124 (1984). However, far from unambiguously supporting the government's position that the primary motive be for profit, the "entered into for profit" language of section 108 does not require any particular degree of profit motive. Even viewing the government's position most favorably, the language is ambiguous in not specifying the importance of profit in the decision to enter a transaction. In at least two cases the tax court has been forced to interpret the same language in section 165(c)(2) because the language does not direct whether to use the taxpayer's subjective intent or some objective standard in applying the statute. *See Smith v. Commissioner,* 78 T.C. 350, 391 (1982); *Fox,* 82 T.C. at 1018–22. Further, the sec-

tion does not furnish guidance when the taxpayer is shown to have had more than a single motive. The phrase "transaction entered into for profit" is thus sufficiently ambiguous to warrant a study of the legislative history of section 108 for interpretative assistance. *Miller v. Commissioner,* 84 T.C. 827, 834–46 (1985).

■ The Conference Committee Report, H.Rep. No. 861, 98th Cong., 2d Sess. 171, 757, 917, (Conf.Rept.) (1984), *reprinted in* 1984 U.S.Code Cong. & Ad.News 697, 1445, 1605, reads as follows:

> In determining whether the position is part of a transaction entered into for profit, it is intended that the provision be applied by treating the condition as satisfied *if there is a reasonable prospect of any profit* from the transaction. (emphasis added).

The correct interpretation is that there need only be a reasonable expectation of profit. Such an interpretation is supported, as we have indicated, by the language and intent of section 108. The language of section 108 is "if such position is part of a transaction entered into for profit." The language does not suggest any requirement that profit be the dominant motive. Further, section 108 of the Deficit Reduction Act was specifically enacted to liberalize the tax situation for investors in straddles. *Id.* Allowing the deduction when profit is a motive, rather than the dominant motive, is consistent with this intent.

The government, however, counters that having only a reasonable prospect of any profit would make superfluous section 108(b), which establishes a presumption that dealers or regular investors entered into their straddles for profit. Because the "reasonable prospect of *any* profit" test would be so easy to meet, there would be no need for a separate provision protecting dealers.

The distinctions of subsection (b), however, go to a procedural burden of proof and not to substantive law. Subsection (b) gives dealers a presumption of a profit

motive whereas under subsection (a) the ordinary taxpayer carries the initial burden of proving he entered a transaction with some reasonable prospect of profit.

■ The government also contends that section 108 applies only to dealers as opposed to dealers and customers. As indicated in the distinction made in the burden of proof between two classes of taxpayers, Congress clearly separated dealers from customers when it so intended. Congress did not distinguish between customers and dealers in defining the scope of section 108. Therefore, section 108 applies to both dealers and customers.

The government further argues that even if the jury instruction requiring profit be the primary motive were erroneous, that error is harmless because the Wehrly transaction was a sham. Although we note that in *Brown v. Commissioner*, 85 T.C. (P–H) 536 (1985), the tax court found one of the Wehrlys' co-investor's investment with GGS a sham, we cannot tell from the general jury verdict for the government whether the Wehrlys' nearly identical investment was also found to be a sham. Moreover, we cannot say as a matter of law that the transaction was a sham. Because the verdict could have been based on the erroneous primary profit motive instructions, we must reverse and remand. *Northern Pacific Railway v. Herman*, 478 F.2d 1167 (9th Cir.1973); *see United States v. Sacco*, 428 F.2d 264, 267 (9th Cir.), *cert. denied*, 400 U.S. 903, 91 S.Ct. 141, 27 L.Ed.2d 140 (1970).

## CONCLUSION

The trial court erred in instructing the jury that for the Wehrlys to qualify for a loss deduction their primary motive must be profit.[2]

REVERSED and REMANDED.[3]

2. Our decision is limited to the construction of the language in section 108, and is specifically *not intended to alter prior interpretations of the* similar language in section 165(c)(2).

FLETCHER, Circuit Judge, dissenting:

I respectfully dissent. The majority relies essentially on one sentence in the Conference Committee Report that accompanied the Deficit Reduction Act of 1984 to conclude that Congress intended a different meaning for the phrase "transaction entered into for profit" in section 108 from its well-established meaning in other parts of the Internal Revenue Code. In 1938, the Supreme Court first interpreted this phrase to require that a taxpayer's primary motive for entering into a transaction be profit. *Helvering v. National Grocery Co.*, 304 U.S. 282, 289 n. 5, 58 S.Ct. 932, 936 n. 5, 82 L.Ed. 1346 (1938). "The subjective, primary purpose test has since been adopted as the standard to be applied in determining whether a transaction is 'entered into for profit' in cases arising under section 165(c)(2) and its predecessor, section 23(e)." *Miller v. Commissioner*, 84 T.C. 827, 851–52 (1985) (Simpson, J., dissenting) (citing cases). I cannot agree with the majority's conclusion that in section 108 of the Deficit Reduction Act of 1984, Congress effected a radical change in the meaning of "transaction entered into for profit."

I find persuasive the reasoning of the dissenting opinions in *Miller* in which the Tax Court split 10–8 on this precise issue. "[W]hen Congress used the phrase 'transaction entered into for profit' in section 108, its well-established meaning must have been evident to those working with the statute. We must presume that Congress intended such phrase to have the same meaning when used in section 108." *Id.* at 852. The "vague sentence" in the Conference Committee Report, *see id.* at 850, on which the majority bases its holding, is countered by statements in the Congressional Record by Senator Metzenbaum and Representative Ottinger that give no indication that Congress intended to extend the relief of section 108 to all traders in tax straddles. *See id.* at 855–56. More sub-

3. Like its sham contention, the government's other similar contentions can be raised on remand.

stantial evidence of Congress's intent to change to an objective "reasonable expectation of any profit" standard is required to warrant a deviation from existing statutory interpretation. I also find persuasive the Government's argument that the statutory scheme is skewed by the majority's interpretation. It makes section 108(b)'s presumptions favoring dealers and regular investors superfluous.

I would hold that the district court properly instructed the jury that the losses were deductible only if the Wehrlys' primary motive for entering into the transactions was to make a profit, and would accordingly affirm.