DAVID COOK, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3122-82.          Filed May 12, 1988.

*Eric R. Fox,* for the petitioner.
*Carolyn A. Boyer,* for the respondent.

OPINION

NIMS, *Judge:* This matter is before the Court on petitioner's motion for reconsideration of findings and opinion. Petitioner was one of the petitioners in the London options consolidated group as to which the Court published an opinion denominated *Glass v. Commissioner,* 87 T.C. 1087 (1986) (Court-reviewed).

On November 23, 1987, the Court promulgated the following:

ORDER

On June 17, 1987, petitioner in the case at docket No. 3122-82 filed a Motion for Reconsideration of Findings and Opinion in *Glass v. Commissioner,* 87 T.C. 1087 (1986). Petitioner's Motion for Reconsideration of Findings and Opinion in the case at docket No. 3122-82 was calendared for hearing on July 22, 1987. The parties in the case at docket No. 3122-82 were present at the July 22, 1987 hearing, and the hearing was continued to September 30, 1987. Upon due consideration, it is

ORDERED that petitioner's Motion for Reconsideration of Findings and Opinion in *Glass v. Commissioner,* 87 T.C. 1087 (1986), is hereby granted in that the issues to be resolved in the case at docket No. 3122-82 are the following:

Whether the per se presumption applicable to the losses of a dealer under section 108 of the Deficit Reduction Act of 1984, as amended by section 1808(d) of the Tax Reform Act of 1986, is applicable to losses claimed with respect to straddle transactions undertaken on a foreign exchange not regulated by a United States entity or to straddle transactions which the Court has previously determined "lacked economic substance and w[ere] a sham."

The parties in the case at docket No. 3122-82 submitted to the Court a statement of the above issues to be resolved. It is further

ORDERED that the case at docket No. 3122-82 is severed from the group previously consolidated on the London Option issue in *Glass v. Commissioner,* 87 T.C. 1087 (1986).

For convenience, section 108 of Division A of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 630, and the later amendment to section 108 made by section 1808(d) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2817, are reproduced in Appendix A.

In our *Glass* opinion, we stated our understanding from the record that "The case before us does not involve commodities dealers." (87 T.C. at 1167.) By amendment to petition filed with leave of Court on July 22, 1987, petitioner amended paragraph 5(c) of his petition to allege the following:

During all of 1976 and 1977, Petitioner was a commodities dealer within the meaning of section 1402(i)(2)(B) of the Internal Revenue Code of 1954.

In his responsive pleading, respondent admits that during 1976 and 1977, "petitioner was a commodities dealer within the meaning of section 108(f) of the Tax Reform Act of 1984, as amended by the Tax Reform Act of 1986." Section 108(f) adopts the definition of "dealer" contained in section 1402(i)(2)(B).[1] Consequently, at least insofar as petitioner is concerned, our statement in *Glass* that the case did not involve commodities dealers was inaccurate.

---

[1]Except where reference is made to sec. 108, all section references are to sections of the Internal Revenue Code in effect for the years in issue.

It having now been agreed that petitioner was a dealer during 1976 and 1977, the parties on brief focus their attention on the following questions:

(1) Whether the per se rule under section 108(b) is available for losses claimed from a "London options transaction" (defined in *Glass*, 87 T.C. at 1155) which the Tax Court has determined lacks economic substance and was a sham; and

(2) Whether the per se rule under section 108(b) is applicable to losses claimed from transactions undertaken on a foreign exchange that is not regulated by a U.S. entity.

At the time he filed his petition in this case, petitioner resided in Los Altos, California.

Respondent's statutory notice determined deficiencies in petitioner's income tax for the calendar years 1976 and 1977 in the amounts of $862,188 and $136,108, respectively. Although the statutory notice listed five different types of adjustments to petitioner's taxable income, substantially all of the deficiency is attributable to the disallowance of capital losses in the amounts of $1,250,022.80 and $217,782.00 derived from his commodity straddle trading activities during 1976 and 1977, respectively. The only issue still contested by petitioner is whether any capital losses incurred by petitioner from his straddle trading activities during the years in issue were properly deducted.

Petitioner's commodity straddle trading activities were based upon trading conducted on the London Metal Exchange (LME), and were executed by or through Competex, S.A., as broker/dealer. The trading strategy of Competex, S.A., vis-à-vis the so-called London options transaction, is described in detail in *Glass* and need not be repeated here. See 87 T.C. at 1107-1117.

During the course of the trial in *Glass*, the Deficit Reduction Act of 1984 (DEFRA) was enacted. Section 108(a) of DEFRA provided in general that certain losses from the disposition of one leg of a straddle entered into prior to 1982 were deductible if the straddle was entered into for profit. Section 108(b) of DEFRA also provided in general that straddle transactions of commodities dealers were rebuttably presumed to be entered into for profit.

Subsequently, section 108 of DEFRA was amended by section 1808(d) of the Tax Reform Act of 1986 (TRA-86). Amended section 108 of DEFRA (unless otherwise stated, all references hereinafter to "section 108" shall mean section 108 of DEFRA, as amended by section 1808(d) of TRA-86) provided that losses attributable to the disposition of a leg of a commodity straddle which were incurred in a trade or business before 1982 were deductible and that losses arising from the disposition of a straddle leg which were incurred by commodities dealers, as defined in section 1402(i)(2)(B), were deemed per se to be incurred in a trade or business.

In *Glass,* we held that no petitioner was entitled to deduct the commodity trading losses in issue because the transactions in which they were incurred lacked economic substance. We discussed section 108, but although we noted that "amended section 108 * * * makes it clear that losses incurred by commodities dealers trading in commodities are deductible under section 108 since they are losses incurred in a trade or business" (87 T.C. at 1167), we did not pursue this avenue because, as stated, we understood that "The case before us does not involve commodities dealers." (87 T.C. at 1167.)

In *King v. Commissioner,* 87 T.C. 1213 (1986) (Court-reviewed), decided after *Glass,* we held that an individual commodities dealer who entered into straddle transactions prior to 1982 was entitled to deduct his losses under section 108 without regard to the existence of a profit motive. We held that this is a per se rule and no longer a rebuttable presumption. 87 T.C. at 1218-1219. After the decision in the *King* case was published, petitioner filed the motion under present consideration.

The parties were directed by the Court to make the same assumption for purposes of argument as the Court made in *Glass;* namely, "that the commodity options and futures contracts which [petitioner] entered into were actual contracts."[2] See *Glass,* 87 T.C. at 1172. Thus, just as in *Glass,* we focus our attention not on whether petitioner has sufficiently authenticated his transactions (i.e., proved that there were actual transactions), but rather whether such

[2]Respondent has never conceded that the contracts were actual contracts.

transactions, assuming they are proven to have occurred, fall within the ambit of the per se rule of section 108.

## *Petitioner's Position*

Petitioner asks the Court to conclude that, as a matter of law, losses incurred by petitioner in 1976 and 1977 from the disposition of certain commodity straddle positions were incurred in a trade or business and were therefore deductible. Petitioner's contention "rests exclusively" (petitioner's opening brief, p. 6) on section 108 (and very specifically section 108(b)) which, in relevant part, now provides as follows:

Sec. 108. TREATMENT OF CERTAIN LOSSES ON STRADDLES ENTERED INTO BEFORE EFFECTIVE DATE OF ECONOMIC RECOVERY TAX ACT OF 1981.

(a) GENERAL RULE.—For purposes of the Internal Revenue Code of 1954, in the case of any disposition of 1 or more positions—

(1) which were entered into before 1982 and form part of a straddle * * *

any loss from such disposition shall be allowed for the taxable year of the disposition if such loss is incurred in a trade or business, * * *

(b) LOSS INCURRED IN A TRADE OR BUSINESS.—For purposes of subsection (a), any loss incurred by a commodities dealer in the trading of commodities shall be treated as a loss incurred in a trade or business.

\* \* \* \* \* \* \*

(f) COMMODITIES DEALER.—For purposes of this section, the term "commodities dealer" means any taxpayer who—

(1) at any time before January 1, 1982, was an individual described in section 1402(i)(2)(B) of the Internal Revenue Code of 1954 (as added by this subtitle), * * *

Petitioner argues that during 1976 and 1977, the years in issue, he was a commodities dealer within the meaning of section 108(f), a fact not in dispute. During 1976 and 1977, he incurred losses from the disposition of commodity straddle positions. From this petitioner argues that under section 108 these two facts, taken together, inescapably lead to the conclusion that he must be irrebuttably presumed to have incurred losses in a trade or business and that such losses must be allowed.

For purposes of this proceeding, petitioner concedes that his commodity straddle transactions lacked economic substance and were a sham in the economic sense. (Petitioner's

opening brief, p. 6.)[3] This is consistent with our holding in *Glass.* 87 T.C. at 1177.

## Respondent's Position

Respondent argues that the per se rule of section 108(b) is not available for losses claimed from the London options transaction because the transaction was not bona fide. The Court found the transaction to be a sham in substance, prearranged solely to achieve a tax-avoidance objective. As such, section 108(a) did not apply in determining whether the losses were allowable. Because section 108(a) was not at issue, the per se rule of section 108(b) does not come into play. Furthermore, Congress did not intend for the per se rule to apply to transactions that were fictitious or prearranged. The London options transaction was prearranged.

Respondent also argues that the per se rule does not apply to transactions on foreign exchanges like the London Metal Exchange since an assumption that the transactions were bona fide cannot be made.

--------

Petitioner maintains that the word "sham" can have more than one meaning, and that respondent can prevail on his sham argument only if petitioner's transactions were a sham in the sense of being fake or fictitious, and cannot prevail if the transactions were a sham in the sense that they lacked profit motivation. He further maintains that there is no suggestion that economic substance is in any way a prerequisite to application of the per se rule of section 108. Petitioner thus implicitly concedes that the benefit of the dealer per se rule in section 108(b) is unavailable in commodity straddle cases involving fictitious transactions, despite the section's flatly stated fiat.

Not surprisingly, petitioner places heavy emphasis upon our holding in *King v. Commissioner, supra.* Marlowe King was a registered member of the Chicago Mercantile Exchange (CME), a domestic board of trade subject to regulation by the Commodities Futures Trading Corporation

---

[3]Petitioner reserves the right to argue the economic substance issue, if appropriate, in any other proceeding.

(CFTC). King was a commodities dealer within the meaning of section 1402(i)(2)(B). During 1980 and 1981, King entered into certain gold straddles. Liquidation of certain of the legs of his straddle positions generated a short-term capital loss of $1,452,900 in 1980 which King deducted on his 1980 return and which the Commissioner disallowed.

King filed a motion for summary judgment asking for a ruling that, as a matter of law, the 1980 losses referred to in the preceding paragraph were deductible under section 108. The Commissioner sought to have King's motion denied on three separate grounds:

(1) Taxpayer failed to address the threshold issue of whether the transactions at issue were shams;

(2) Taxpayer failed to show that he is entitled to the presumption under section 108(b) of the Tax Reform Act of 1984 and Temporary Treasury Regulations Section 1.165-13T; and

(3) Even if taxpayer were entitled to the presumption, a trial would nevertheless be required to resolve the "for profit" issue which is inherently factual. (87 T.C. at 1216.)

In *King* the deficiency notice asserted that "The transactions at issue were either shams or devoid of the substance necessary for recognition for federal income tax purposes." (87 T.C. at 1216.) However, in his defense against King's motion for summary judgment, the Commissioner failed to allege or support any facts tending to demonstrate that the transactions in question were shams in any sense. The taxpayer, on the other hand, included in his affidavit detailed facts supporting the bona fide nature of his trading in gold contracts. We held that "Under these circumstances, respondent has not shown that there is a genuine issue of sham for trial." 87 T.C. at 1217.

In *King* we granted summary judgment for the taxpayer on the ground that the gold straddles were not fictitious, i.e., they were actual contracts, and, as previously stated, that the taxpayer was not required to show a profit motive. The Commissioner did not argue nor did we consider whether the straddles were prearranged and lacked economic substance. Cf. *DeMartino v. Commissioner*, T.C. Memo. 1986-263 (straddles which were prearranged, were not executed at free market prices, reflected virtually no

changes in the spreads, and were executed in an abnormally thin market held to be shams).

While reaching the foregoing result in *King,* we nevertheless expressly refrained from drawing any conclusions as to what the result might be under other circumstances. In footnote 8, page 1219, of *King,* we said:

> The per se rule of sec. 108(b) would not preclude us from finding for respondent in another case. The legislative history of the provision makes clear that it was not intended to apply "where the trades were fictitious, prearranged, or otherwise in violation of the rules of the exchange in which the dealer is a member." H. Rept. 99-426, at 911 (1985). [1986-3 C.B. (Vol. 2), at 911.] See also *DeMartino v. Commissioner,* T.C. Memo. 1986-263.

Respondent relies primarily upon our holding in *Glass v. Commissioner, supra,* that the London options transaction lacked economic substance and was therefore a sham. This conclusion was based not upon a finding that the commodity contracts were fake or fictitious, but rather on a finding that even if the straddles consisted of actual contracts (a fact which was left undetermined), the transactions, nevertheless, lacked economic substance and were a sham because the realization of tax losses in year one of the London options transaction was preordained. We further held that section 108 is not available to permit loss deductions where the sham involves a series of transactions having no business or profit-making function apart from obtaining tax deductions.[4]

Petitioner somewhat tangentially acknowledges that the legislative history of amended section 108 suggests an exception to the dealer per se rule by referring to the language quoted from the House report in footnote 8 of *King.* For completeness and in fairness to petitioner, we should also note that the Conference Committee statement of managers states that "If a person qualifies as a commodities dealer, the subsection (b) treatment applies with respect to any position disposed of by such person." H. Rept. 99-841 (Conf.), at II-845, 1986-3 C.B. (Vol. 4) 845.

This leads us to a consideration of two recent Circuit Court cases which, in analyzing the profit motive standard

---

[4]As petitioner has pointed out, see *supra,* we drew no distinction between straddle transactions of dealers and investors.

of the 1984 version of section 108, juxtapose diametrically opposing views as to the appropriateness of using the legislative history as an aid in construing the section 108 statutory language.

The first of these cases is *Miller v. Commissioner,* 836 F.2d 1274 (10th Cir. 1988), revg. 84 T.C. 827 (1985). The Circuit Court held that the phrase "transaction entered into for profit" found in section 108(a) is to be construed consistently with prior case law under section 165(c)(2), commencing with *Helvering v. National Grocery Co.,* 304 U.S. 282 (1938), and followed for almost 50 years. 836 F.2d at 1278. In a footnote in *National Grocery,* the Supreme Court said that "the deductibility of losses under [the predecessor of section 165(c)(2)] may depend upon whether the taxpayer's motive in entering into the transaction was primarily profit." 304 U.S. at 289 n. 5. In *King v. United States,* 545 F.2d 700, 708 (10th Cir. 1976), the 10th Circuit had held that "in order to deduct a loss under sec. 165(c)(2) the taxpayer must show that profit was the primary motivation." In *Miller* the 10th Circuit held that since section 108(a) is clear on its face in light of this past history, resort to the legislative history would be inappropriate. In so concluding, the court acknowledged that its decision was in conflict with that of the Ninth Circuit in *Wehrly v. United States,* 808 F.2d 1311 (9th Cir. 1986), discussed *infra.*

Following the 10th Circuit's line of thought, it could be argued that a reading of the statutory language in the case now before us, without resort to the Committee reports, would go a long way in carrying the day for petitioner.

The second significant Circuit Court case is *Wehrly v. United States, supra.* In this case, the Ninth Circuit (the court to which this case would be appealed), construing the identical language of section 108 later construed by the *Miller* Circuit Court, held that the term "transaction entered into for profit" as used in section 108 allows a deduction for loss when the taxpayer had a reasonable expectation of profit, and does not require profit to have

been the dominant motive of the transaction.[5] In reaching this result, the Ninth Circuit found that the subject phrase was sufficiently ambiguous in the section 108 context to warrant a study of the legislative history for interpretative assistance. 808 F.2d at 1314. The court then went on to quote language in the Conference Committee report pointing toward the appropriate profit motive standard to be applied. 808 F.2d at 1314.

Section 108(b) in its present form is straightforward enough: "For purposes of subsection (a), any *loss incurred* by a commodities dealer in the trading of commodities shall be treated as a *loss incurred* in a trade or business." (Emphasis added.) Nevertheless, as we have emphasized earlier, the House report flatly states that "the presumption would not be available in any cases where the trades were fictitious, prearranged, or otherwise in violation of the rules of the exchange in which the dealer is a member." H. Rept. 99-426, at 911, 1986-3 C.B. (Vol. 2) 911.

The straddles in question were unquestionably prearranged, and petitioner does not dispute this. The next question is whether we may appropriately consider the legislative history in construing section 108(b), because the legislative history expressly provides a caveat to the per se rule. We believe that it is appropriate for us to do so.

In *Perlin v. Commissioner*, 86 T.C. 388, 419 (1986), we stated that "When interpreting a statute, and especially a new statute, a court may look to legislative history for interpretative assistance." (Citations omitted.) See also *King v. Commissioner*, 87 T.C. at 1219 n. 7. The Supreme Court itself has said that "When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use [footnote ref. omitted], however clear the words may appear on 'superficial examination.' " *United States v. American Trucking Associations.*, 310 U.S. 534, 543-544 (1940); quoted with approval in *Train v. Colorado Public Interest Research Group*, 426 U.S. 1, 10 (1976). We perhaps adumbrate the obvious by emphasizing this point, but we believe it is

---

[5]In *Glass v. Commissioner*, 87 T.C. 1087, 1177 (1986), we distinguished *Wehrly* on the ground that the lack of economic substance in the London Option Transaction negates the existence of *any* profit motive.

necessary to explain why we must go beyond a "superficial examination" of the straightforward language of section 108(b).

The "prearranged" language of the Committee report casts a shadow on the otherwise bright-line parameters of the per se rule. Therefore, where the transactions were prearranged, as here, we must examine them to ascertain whether the taxpayer actually incurred losses, a necessary precondition to the application of the per se rule.

In *Glass,* we stated that "the critical inquiry in this case must be whether the losses *putatively incurred* under petitioners' tax straddle scheme * * * are deductible as claimed, or whether the London options transaction lacked economic substance and was therefore a sham." (Emphasis added.) 87 T.C. at 1172. In *Glass,* the putatively incurred losses were central to transactions lacking economic substance and were therefore shams. In effect, then, no losses were incurred. It follows that the per se dealer rule is not available to petitioner since section 108(b) applies only to "any loss" incurred by a commodities dealer. Furthermore, we think it would be highly anomalous to disallow loss deductions to over 1,000 petitioners claiming them under the London options transaction, as we have done in *Glass,* while allowing them to petitioner, even though a dealer, on the self-same transaction.

On brief, petitioner argues that "Any argument that the transactions were prearranged within the meaning of footnote 8 in the *King* case [87 T.C. 1213 (1986)] because they were structured to produce no economic profit or loss cannot withstand scrutiny because it proves too much. Any taxpayer who entered into straddle transactions with a motive to make a profit apart from tax savings has no need to rely on section 108."

The weakness in petitioner's argument is amply illustrated by the *Miller* and *Wehrly* cases on appeal, *supra,* each of which applied a standard of proof to the "transaction entered into for profit" issue which differed from the other: "reasonable expectation of profit" in *Wehrly* versus profit as "primary motivation" in *Miller.* Section 108(b), however, absolves dealers of the need to meet *any* specific profit-motive standard so long as the dealer's transactions

are not fictitious, prearranged, or otherwise in violation of the rules of the exchange in which the dealer is a member. Compare *Perlin v. Commissioner,* 86 T.C. 388, 415-416 (1986), with *DeMartino v. Commissioner,* T.C. Memo. 1986-263. Thus, our holding does not, as petitioner argues, drain the per se rule of its vitality.

It bears repeating that in *King v. Commissioner,* 87 T.C. 1213 (1986), the Commissioner did not argue that the straddle transactions were prearranged, but merely asserted without further facts to support the assertion that the transactions were shams in the sense of being fake or fictitious. Consequently, this Court had no occasion to consider whether the transactions were shams because of a lack of economic substance. We again note, moreover, the regulated nature of the exchange upon which the trades in *King* were made. 87 T.C. at 1217. By contrast, the contracts in *Glass* were tailor-made between broker/dealer and taxpayer, not transacted through "open outcry" on the LME ring, and as the facts in *Glass* amply bear out, were deliberately prearranged.

We accordingly hold that it is appropriate before applying the per se rule of section 108(b) to enquire whether straddle transactions were fictitious, prearranged, or otherwise in violation of the rules of the exchange, and if so, whether there were losses actually incurred.[6] Since the straddle transactions in *Glass* were prearranged, causing the transactions to lack economic substance, petitioner incurred no losses to which the per se rule can be applied. We therefore hold for respondent.

Because we hold for respondent on the above grounds, we need not address his other arguments.

*An approriate order will be issued.*

Reviewed by the Court.

STERRETT, CHABOT, PARKER, KÖRNER, SHIELDS, HAMBLEN, COHEN, CLAPP, SWIFT, JACOBS, WRIGHT,

---

[6]Cf. *Sochin v. Commissioner,* 843 F.2d 351, 353 n. 6 (9th Cir. 1988), affg. *Brown v. Commissioner,* 85 T.C. 968 (1985) (the "reasonable expectation of profit" standard of sec. 108(a) is not applied until the Court determines that the transaction is itself bona fide, i.e., that it is not a sham).

PARR, WELLS, and WHALEN, *JJ.*, agree with the majority opinion.

GERBER and RUWE, *JJ.*, did not participate in the consideration of this case.

## APPENDIX A

Division A of the Deficit Reduction Act of 1984,
Pub. L. 98-369, 98 Stat. 494, 630 (Section 108)

Sec. 108. TREATMENT OF CERTAIN LOSSES ON STRADDLES ENTERED INTO BEFORE EFFECTIVE DATE OF ECONOMIC RECOVERY TAX ACT OF 1981.

(a) GENERAL RULE.—For purposes of the Internal Revenue Code of 1954, in the case of any disposition of 1 or more positions—

(1) which were entered into before 1982 and form part of a straddle, and

(2) to which the amendments made by title V of such Act do not apply,

any loss from such disposition shall be allowed for the taxable year of the disposition if such position is part of a transaction entered into for profit.

(b) PRESUMPTION THAT TRANSACTION ENTERED INTO FOR PROFIT.—For purposes of subsection (a), any position held by a commodities dealer or any person regularly engaged in investing in regulated futures contracts shall be rebuttably presumed to be part of a transaction entered into for profit.

(c) NET LOSS ALLOWED WHETHER OR NOT TRANSACTION ENTERED INTO FOR PROFIT.—If any loss with respect to a position described in paragraphs (1) and (2) of subsection (a) is not allowable as a deduction (after applying subsections (a) and (b)), such loss shall be allowed in determining the gain or loss from dispositions of other positions in the straddle to the extent required to accurately reflect the taxpayer's net gain or loss from all positions in such straddle.

(d) OTHER RULES.—Except as otherwise provided in subsections (a) and (c) and in sections 1233 and 1234 of such Code, the determination of whether there is recognized gain or loss with respect to a position, and the amount and timing of such gain or loss, and the treatment of such gain or loss as long-term or short-term shall be made without regard to whether such position constitutes part of a straddle.

(e) STRADDLE.—For purposes of this section, the term "straddle" has the meaning given to such term by section 1092(c) of the Internal Revenue Code of 1954 as in effect on the day after the date of the enactment of the Economic Recovery Tax Act of 1981, and shall include a straddle all the positions of which are regulated futures contracts.

(f) COMMODITIES DEALER.—For purposes of this section, the term "commodities dealer" has the meaning given to such term by section 1402(i)(2)(B) of the Internal Revenue Code of 1954 (as added by this subtitle).

(g) REGULATED FUTURES CONTRACTS.—For purposes of this section, the term "regulated futures contracts" has the meaning given to such term by section 1256(b) of the Internal Revenue Code of 1954 (as in effect before the date of enactment of this Act).

(h) SYNDICATES.—Subsection (b) shall not apply to any syndicate (as defined in section 1256(e)(3)(B) of the Internal Revenue Code of 1954).

Tax Reform Act of 1986, Pub. L. 99-514,
100 Stat. 2085, 2817 (Section 1808(d))

(d) SECTION 108.—Section 108 of the Tax Reform Act of 1984 is amended—

(1) by striking out "if such position is part of a transaction entered into for profit" and inserting in lieu thereof "if such loss is incurred in a trade or business, or if such loss is incurred in a transaction entered into for profit though not connected with a trade or business",

(2) by striking out subsection (b) and inserting in lieu thereof the following:

"(b) LOSS INCURRED IN A TRADE OR BUSINESS.—For purposes of subsection (a), any loss incurred by a commodities dealer in the trading of commodities shall be treated as a loss incurred in a trade or business.",

(3) by striking out the heading for subsection (c) and inserting in lieu thereof the following:

"(c) NET LOSS ALLOWED.—",

(4) by striking out subsection (f) and inserting in lieu thereof the following:

"(f) COMMODITIES DEALER.—For purposes of this section, the term 'commodities dealer' means any taxpayer who—

"(1) at any time before January 1, 1982, was an individual described in section 1402(i)(2)(B) of the Internal Revenue Code of 1954 (as added by this subtitle), or

"(2) was a member of the family (within the meaning of section 704(e)(3) of such Code) of an individual described in paragraph (1) to the extent such member engaged in commodities trading through an organization the members of which consisted solely of—

"(A) 1 or more individuals described in paragraph (1), and

"(B) 1 or more members of the families (as so defined) of such individuals.", and

(4) by striking out subsection (h) and inserting in lieu thereof the following:

"(h) SYNDICATES.—For purposes of this section, any loss incurred by a person (other than a commodities dealer) with respect to an interest in a syndicate (within the meaning of section 1256(e)(3)(B) of the Internal Revenue Code of 1954) shall not be considered to be a loss incurred in a trade or business."

WHITAKER, *J.*, concurring: I find the majority's reasoning in this case to be faulty and the interpretation of section 108(b) of the Tax Reform Act of 1984, as amended by the Tax Reform Act of 1986, to be erroneous.[1] However, respondent in this case makes the alternative argument that section 108(b) and (f) was not intended to apply to transactions executed on a foreign exchange. I find this argument to be dispositive of the case and conclude, therefore, that the majority has reached the right result but for the wrong reasons. Therefore, I concur in the result only.

Section 108(b) provides—

For purposes of subsection (a), any loss incurred by commodities dealer in the trading of commodities shall be treated as a loss incurred in a trade or business.

However, this unambiguous language is qualified in the report of the House Ways and Means Committee[2] which states in part that:

Further, the presumption would not be available in any cases where the trades were fictitious, pre-arranged, or otherwise in violation of the rules of the exchange in which the dealer was a member. * * * [H. Rept. 99-426, at 911 (1985), 1986-3 C.B. (Vol. 2) 911.]

The hub of the majority opinion seems to be the conclusion that petitioner incurred no loss since the transactions lacked economic substance and that therefore we need never reach section 108.[3] With this reasoning I disagree. Losses actually incurred are disallowed for tax purposes where the transaction lacks economic substance. *Frank Lyon Co. v. United States,* 435 U.S. 561, 573 (1978); *Knetsch v. United States,* 364 U.S. 361, 366 (1960). Unless losses are incurred, the issue does not arise. We found in *Glass* that losses were incurred. See *Glass v. Commissioner,* 87 T.C. 1087, 1105-1106, 1114 (1986). The losses are described in the opinion as "putatively incurred" but, in

---

[1] All references to sec. 108 are intended to refer to that provision as amended by the Tax Reform Act of 1986.

[2] The conference follows the House bill in this respect. H. Rept. 99-841 (Conf.), at II-845 (1986), 1986 C.B. (Vol. 4) 845.

[3] See majority opinion at page 986 where the majority concludes that "Since the straddle transactions in *Glass* were prearranged, causing the transactions to lack economic substance, petitioner incurred no losses to which the per se rule can be applied."

context, that language must refer to the tax consequences of the actual losses.

The majority also attempts to find support for the conclusion that section 108 does not apply in the legislative history by relying on the word "prearranged." Again I disagree with the majority's analysis. I am constrained to conclude that the Ways and Means Committee used the word "prearranged" as equivalent to "fictitious" and as a way of describing that species of transactions which we treat as factual shams as in *Brown v. Commissioner*, 85 T.C. 968 (1985), affd. sub nom. *Sochin v. Commissioner*, 843 F.2d 351 (9th Cir. 1988), and *Julien v. Commissioner*, 82 T.C. 492 (1984). In my judgment, there is no basis for expanding the exclusion from the scope of section 108 beyond that specified in the House Ways and Means Committee report, which should constitute the maximum reach of our legislative interpretation.

This and the *Glass* opinion are the first occasions in which this Court has used "prearranged" to mean other than "false" or "fictitious."[4] In *Glass*, we seem to have used the word "prearranged" in a pejorative way to refer to transactions designed to achieve a desired result, i.e., losses. Although we described the transactions in *Glass* as prear-

---

[4] So far as I have been able to determine this Court has consistently used "prearranged" to mean "rigged," "fixed," "artificial," i.e., a "factual sham." The "manipulation" that occurred in *DeMartino v. Commissioner*, T.C. Memo. 1986-263, was price manipulation in trades that violated the rules of the exchange. Unless this Court is prepared to disregard all transactions on the London Metal Exchange, the kind of factual findings made in *DeMartino* are required here. All the other cases cited by my colleagues likewise presented false or fictitious transactions—so-called factual shams—found by this Court to be shams only after the Court had found the necessary facts to support the conclusion that the transactions were not bona fide. *Forseth v. Commissioner*, 85 T.C. 127, 149 (1985), affd. 813 F.2d 293 (9th Cir. 1987). We stated this principle in a recent Court-reviewed opinion, *Perlin v. Commissioner*, 86 T.C. 388, 415 (1986) as follows:

"Alleged transactions involving commodity futures contracts which are in fact prearranged or fictitious will not be recognized for Federal tax purposes. See *Brown v. Commissioner*, 85 T.C. 968 (1985); *Forseth v. Commissioner*, 85 T.C. 127 (1985); *Miller v. Commissioner*, 84 T.C. 827 (1985), on appeal (10th Cir., Nov. 20, 1985); *Julien v. Commissioner*, 82 T.C. 492 (1984). * * * "

In *Glass v. Commissioner*, 87 T.C. 1087, 1172 (1986), we made no finding that the transactions were factual shams. In contrast, we expressly hypothesized that the transactions were real:

"For purposes of the discussion which follows we assume, without deciding, that the commodity options and futures contracts which petitioners entered into were actual contracts. In thus postulating this assumption, we necessarily focus our attention not on whether petitioners have sufficiently authenticated their transactions (i.e., proved that there were actual transactions), but rather whether such transactions, even if actually proven, are nevertheless sufficient to accomplish the tax results which petitioners contemplated. * * * * "

ranged, our actual holding was that the transactions lacked economic substance and were therefore shams. Here, the opinion refers to the transactions as prearranged apparently to enhance the opinion's effort to come within the exclusion from the benefit of section 108(b) set forth in the committee report. However, the majority makes no effort to determine what Congress intended by its use of the word "prearranged," and, furthermore, the majority's holding is not based on whether the transactions were prearranged, but is based on the conclusion that no losses were incurred.[5]

The 1986 committee report explains the necessity for the inclusion of section 108(b) in the 1984 Act by stating that a profit-motive presumption was provided for commodities dealers "because of the inherent difficulty in distinguishing tax-motivated straddle transactions from profit-motivated straddle transactions when the taxpayer was in the trade or business of trading in commodities." H. Rept. 99-426, at 910-911 (1985), 1986-1 C.B. (Vol. 2) 910-911. Although transactions without economic substance but motivated by tax considerations are normally not recognized for tax purposes (*Frank Lyon Co. v. United States, supra*), Congress, by enacting section 108, intended to allow straddle trading losses of commodities dealers. Those transactions are not to be tested for economic substance, at least, as I conclude, where effected in the domestic market. Thus, petitioner would fit within section 108(b) unless Congress intended to protect dealers only when trading in U.S. markets. The majority opinion simply writes section 108 off the books, without recognizing that more than 80 years ago the Supreme Court held that there is a presumption against interpreting a statute in a way that renders it ineffective or futile. *Bird v. United States,* 187 U.S. 118, 124 (1902). This rule of statutory construction is particularly apt where, as here, Congress restated retroactively with some modification in the 1986 Act the provision first enacted in the 1984 Act. I believe the majority should instead focus on the scope of the section.

---

[5]In my opinion, in order for the majority to rely on the word "prearranged" (assuming, as I conclude, that Congress used that word as synonymous with "fictitious") the majority could not rely on *Glass,* but would have to make express findings that the transactions were fictitious.

Section 108(f) of the act defines a commodities dealer as a taxpayer who is an individual described in section 1402(i)(2)(B). Section 1402(i)(2)(B) defines a commodities dealer as "a person who is actively engaged in trading section 1256 contracts and is registered with a domestic board of trade which is designated as a contract member by the commodities futures trading commission." The parties here agree that petitioner is such a commodities dealer. Majority opinion at pages 976-977. But that does not answer the inquiry. To determine the scope of section 108, I look again to the committee report. That report provides in part:

If a person qualifies as a commodity dealer, the subsection (b) treatment applies with respect to any position disposed of by such person. It would, for example, apply without regard to whether the position was in a commodity regularly traded by the person, *whether it was traded on an exchange on which the dealer was a member,* or whether an identical position was reestablished on the same trading day or subsequently.

In the cases of trade on a domestic exchange described in Code section 1402(i)(2)(B), the identification of positions disposed of shall be as provided in exchange procedures and records of the exchange or clearing house shall be controlling in the absence of proof that the rules were violated. * * * Further, the presumption would not be available in any cases where the trades were fictitious, prearranged or *otherwise in violation of the rules of the exchange in which the dealer is a member.*

[H. Rept. 99-426, at 911 (1985), 1986-3 C.B. (Vol. 2) 911; emphasis supplied.]

The committee obviously was concerned with the normal trading pattern of commodities dealers it was intending to benefit. It was only the losses incurred in that normal trading pattern which would present the problem of classification between business and tax motivation. Trading on the London metals exchange does not comport with the rules of trading in the United States on any of the several domestic commodities futures exchanges. The London options transactions would have been in violation of the rules of the commodities exchanges in this country. The presumption of section 108(b) would, therefore, not apply to trades by petitioner on the London Metal Exchange.

Moreover, the definition of the term "commodity dealers" as set forth in section 1402(i) refers to a person who is engaged in trading section 1256 contracts. Section 1256(b) defines a section 1256 contract to mean—

(1) any regulated futures contract,

(2) any foreign currency contract,

(3) any nonequity option, and

(4) any dealer equity option.

This provision was added to the Code by Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 503(a), 95 Stat. 327. The definitions of these terms set out in section 1256(b) as amplified by the applicable committee reports [6] demonstrate that section 1256 contracts refer to financial transactions which take place on domestic exchanges or in the interbank market in the United States. The concern which Congress sought to avoid by enacting section 108 was to preclude the Internal Revenue Service from attacking straddle transactions of a taxpayer trading for his own account through the domestic investment banking or securities dealer facilities used for customers. There is no difficulty distinguishing transactions such as those here involved where the commodities dealer taxpayer uses trading facilities and dealers doing business in a foreign country.

In my opinion, a commodities dealer during this period of time who chose for his own account to trade in a foreign market simply placed those transactions outside the scope of section 108. It is on this basis that I would hold for respondent in this case.

WILLIAMS, *J.,* agrees with this concurring opinion.

---

WELLS, *J.,* concurring: I agree with the majority opinion, but Judge Whitaker raises an additional ground with which I also agree. Judge Whitaker concludes that because the transactions on the London Metals Exchange would have been in violation of the rules of domestic exchanges in the United States, the presumption of section 108 does not apply to shield petitioner's trades. As an alternative ground for a holding for respondent in the instant case, I agree with Judge Whitaker's conclusion.

---

[6]S. Rept. 97-144, at 158 (1981), 1981-2 C.B. 475; H. Rept. 97-215 (Conf.), at 258 (1981), 1981-2 C.B. 512.

I also would like to address other comments made by Judge Whitaker with which I disagree. Judge Whitaker states that the "majority opinion simply writes section 108 off the books." With that I do not agree. The majority opinion interprets Congress' intent to be that section 108[1] does not serve to shelter from scrutiny transactions which were fictitious, prearranged, or otherwise in violation of the rules of the exchange. Dealers' transactions which are not fictitious, are not prearranged, and are in accordance with the rules of the exchange still are fully protected by section 108, i.e., such transactions per se are deemed to be entered into in the course of a trade or business and losses thereon are allowed. See H. Rept. 99-426 (Conf.), at 911 (1985), 1986-3 C.B. (Vol. 2) 911. Judge Whitaker seems to suggest that transactions by dealers which are devoid of economic substance are to be protected from disallowance by section 108. Congress surely did not intend such a result. The House report's reference to fictitious and prearranged transactions bears out such a conclusion. Congress may not have used the buzz words "economic substance," but what are transactions which are either prearranged or fictitious other than transactions devoid of economic substance?

Judge Whitaker's interpretation of the word "prearranged" is too narrow. He would limit its use to the description of a transaction that is illusory because it is fictitious, i.e., did not take place or only took place in the papers drawn up to take advantage of the tax benefits. He apparently would not use the word "prearranged" to describe a transaction which may have actually taken place in the marketplace, but which was entered into from the outset in such a way as to be designed to lack any real economic significance. I would subscribe to the broader view of the interpretation of the word "prearranged."[2] Transactions that are fictitious and transactions that are prearranged are both illusory transactions. By using the word "prearranged" in the House report, I believe Congress intended that we should scrutinize illusory transactions of both types.

---

[1] All references to "section 108" are to sec. 108 of the Deficit Reduction Act of 1984 as amended by the Tax Reform Act of 1986.

[2] Any other interpretation would render superfluous the language in the House report, "fictitious, prearranged."

The purpose of section 108 is to eliminate the requirement that commodities dealers prove a subjective profit motive, as might otherwise be required by section 165(c) of the Internal Revenue Code. Section 108 is not a carte blanche grant to commodities dealers of tax benefits for illusory transactions.[3] It is clear that Congress did not intend to single out commodities dealers for special treatment for transactions which lack economic substance. The economic substance test was in existence prior to the enactment of section 108,[4] and Congress easily could have provided that transactions of commodities dealers need not have economic substance if Congress had so intended.

STERRETT, CHABOT, PARKER, HAMBLEN, COHEN, JACOBS, WRIGHT, and PARR, *JJ.*, agree with this concurring opinion.

---

[3]As we noted in *Cherin v. Commissioner,* 89 T.C. 986, 992 (1987) (Court-reviewed), the existence of a profit motive simply does not preclude a finding that a transaction lacks economic substance. Certainly, the fact that a taxpayer is in a trade or business (as sec. 108 deems commodity dealers to be) does not preclude the taxpayer's transactions from being subject to a test for economic substance.

[4]See, e.g., *Frank Lyon Co. v. Commissioner,* 435 U.S. 561, 583-584 (1978).